RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name:  05a0093p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

PRIME MEDIA, INC.,

     *Plaintiff-Appellee,*

  *v.*

CITY OF BRENTWOOD, TENNESSEE,

     *Defendant-Appellant.*

No. 04-5012

> Appeal from the United States District Court
> for the Middle District of Tennessee at Nashville.
> No. 02-01034—Todd J. Campbell, District Judge.

Argued:  December 2, 2004

Decided and Filed:  February 24, 2005

Before:  GILMAN and SUTTON, Circuit Judges; McKEAGUE, District Judge.[*]

---

## COUNSEL

**ARGUED:**  Mary Byrd Ferrara, FARRAR & BATES, Nashville, Tennessee, for Appellant.  E. Adam Webb, WEBB & PORTER, LLC, Atlanta, Georgia, for Appellee.  **ON BRIEF:**  Mary Byrd Ferrara, Kristin Ellis Berexa, FARRAR & BATES, Nashville, Tennessee, for Appellant.  E. Adam Webb, WEBB & PORTER, LLC, Atlanta, Georgia, for Appellee.

---

## OPINION

---

  SUTTON, Circuit Judge.  At stake in this case is the constitutionality of an ordinance promulgated by the City of Brentwood, Tennessee, that restricts the size and height of billboards located within the city.  Faced with a claim by an outdoor advertising company that the ordinance violated the company's First Amendment rights, the district court invalidated the law.  Because we conclude that the ordinance is a content-neutral restriction on the time, place and manner of speech, and because Brentwood has satisfied the intermediate scrutiny applicable to such regulations, we reverse.

---

[*]The Honorable David W. McKeague, United States District Judge for the Western District of Michigan, sitting by designation.

I.

In 1999, the City of Brentwood promulgated an ordinance limiting the use of billboards within the city.  The purpose of the ordinance was "to maintain and enhance the environment; to promote the effective use of signs as a means of communication and economic growth; and to advance the safety and welfare of the community as it relates to the use of exterior signs in the City."  JA 483.  Among other restrictions, the ordinance limited the size of billboards to a face area of 120 square feet and a height of six feet, the latter of which includes the length of any pole supporting the sign.  As originally enacted, the ordinance also prohibited off-premises signs—namely, signs "that direct[] attention to a business, commodity, or service offered at a location other than the premises on which the sign is erected."  JA 486.

In October 2002, Prime Media, Inc., an outdoor advertising company, applied for a permit from Brentwood to build and place billboards near Interstate 65.  Relying on the ordinance, Brentwood denied the permit request on three grounds:  it violated the face-size restriction because the proposed billboards would be 672 square feet in size; it violated the height restriction because the proposed billboards would rest on 50- to 73-foot poles and it violated the off-premises restriction because the billboards would not be located on the premises that they were promoting.

After receiving this response, Prime Media filed a lawsuit challenging the constitutionality of the sign ordinance on two grounds—that it violated the free-speech guarantees of the First (and Fourteenth) Amendment and the equal-protection guarantees of the Fourteenth Amendment. While the case was pending in the district court, Brentwood amended the ordinance to remove the off-premises restriction.  The amended ordinance also added a purpose and findings section.  The "[p]urpose" of the new ordinance is to "[i]mprove the visual appearance of the city while providing for effective means of communication, consistent with constitutional guarantees."  JA 510.  The "[f]indings" of the new ordinance say that:

> The city's zoning regulations have always included the regulation of signs in an effort to provide adequate means of expression and to promote the economic viability of the business community, while protecting the city and its citizens from a proliferation of signs of a type, size, location and character that would adversely impact upon the aesthetics of the community and threaten the health, safety and welfare of the community.  The regulation of the physical characteristics of signs within the city has had a positive impact on traffic safety and the appearance of the community.

*Id*.  The amendment did not alter the size and height restrictions.  In response to this development, Prime Media amended its complaint to challenge the constitutionality of the modified ordinance and sought damages arising from injuries caused by the original ordinance.

Faced with cross-motions for summary judgment, the district court concluded that the size and height restrictions restricted speech in a content-neutral manner, but that Brentwood had failed to show that those restrictions were "narrowly tailored" to promote Brentwood's interests in aesthetics and traffic safety. D. Ct. Op. at 9.  The findings of the amended ordinance, the district court reasoned, did not satisfy the tailoring requirement because they provided no comparison with billboards of other sizes and were not supported by studies or analyses of alternative ways to achieve the city's interests:

> Defendant has failed to show that a height maximum of six feet or a size maximum of 120 square feet is narrowly tailored to further or advance its two interests.  There is no factual record on these points.  The findings . . . of the Amended Ordinance are insufficient to carry Defendant's burden to show that the restrictions are narrowly

tailored to further the stated interests. For example, Defendant does not explain how or why billboards which are six feet high are more threatening to safe driving or the beauty of Brentwood than billboards which are slightly taller or even much taller. There is no basis for concluding that the limit of six feet is not an arbitrary limitation. Neither has Defendant shown how or why signs with sign face sizes of more than 120 square feet cause more danger to drivers or detract more from the aesthetics of the City than signs with smaller sign face sizes. There is no factual record of careful calculation of the costs and benefits of these restrictions. Defendant has produced no studies, legislative history or factual analysis as evidence that it considered alternatives and specifically determined that these restrictions were narrowly tailored to further its interests.

D. Ct. Op. at 9–10. Turning to the prohibition on off-premises signs in the original ordinance, the district court concluded that the restriction was content-based, that it was not the least restrictive means to achieve Brentwood's interests, that it was unconstitutional and that Prime Media would be entitled to damages stemming from this provision (if it could prove them) at trial. *Id*. at 10–11. Because the amended ordinance contained a severability clause, the district court did not invalidate the entire law but instead severed the offending provisions from it. *Id*.

## II.

The appeal from this decision raises three issues: (1) Brentwood argues that the district court erred in invalidating the size and height restrictions; (2) Brentwood argues that, if the size and height restrictions satisfy the First Amendment, then Prime Media's money damages claim stemming from the off-premises ban must be rejected because the permit request was denied on the basis of the size and height restrictions as well; and (3) Prime Media, as alternative grounds for affirmance, urges us to address its independent First Amendment facial challenge to the statute and its independent Equal Protection Clause challenge to the statute, both of which the district court did not reach. We review each issue de novo, *see DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004) (order granting summary judgment); *McMullen v. Meijer, Inc.*, 355 F.3d 485, 489 (6th Cir. 2004) (order denying summary judgment on purely legal grounds), and retain authority to review the *denial* of a summary judgment motion when it is presented with an appeal of a successful summary judgment motion, *see id*.

## A.

Billboards and other visual signs, it is clear, represent a medium of expression that the Free Speech Clause has long protected. But, in contrast to oral speech, they "pose distinctive problems" that also have long been subjected to the "police powers" of States and cities because billboards and signs "take up space and may obstruct views, distract motorists, displace alternative uses for land, and pose other problems that legitimately call for regulation." *City of Ladue v. Gilleo*, 512 U.S. 43, 48 (1994). It thus is "common ground that governments may regulate the physical characteristics" of signs and billboards in much the same way that "they can, within reasonable bounds and absent censorial purpose, regulate audible expression in its capacity as noise." *Id.* (citing *Ward v. Rock Against Racism*, 491 U.S. 781 (1989); *Kovacs v. Cooper*, 336 U.S. 77 (1949)).

Just as the First Amendment "does not guarantee the right to communicate one's views at all times and places or in any manner," *Wheeler v. Comm'r of Highways, Commonwealth of Kentucky*, 822 F.2d 586, 589 (6th Cir. 1987), however, so it does not permit municipalities to regulate methods of expression however, whenever and wherever they wish. Because the regulation of a medium of expression "inevitably affects communication itself," *Gilleo*, 512 U.S. at 48, the Court has subjected time, place and manner restrictions on speech to the following test: They "are valid provided [1] that they are justified without reference to the content of the regulated speech, [2]

that they are narrowly tailored [3] to serve a significant governmental interest, and [4] that they leave open ample alternative channels for communication of the information." *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293 (1984); *accord Hill v. Colorado*, 530 U.S. 703 (2000); *Ward*, 491 U.S. 781; *Members of City Council of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789 (1984); *Heffron v. Int'l Soc'y for Krishna Consciousness, Inc.*, 452 U.S. 640, 648 (1981).

The size and height restrictions of the Brentwood ordinance steer clear of several of the obstacles that have claimed other regulators of speech. The restrictions have no censorial purpose, as they are both viewpoint- and content-neutral and regulate only the non-expressive components of billboards. *Cf. Taxpayers for Vincent*, 466 U.S. at 804 ("[T]he First Amendment forbids the government to regulate speech in ways that favor some viewpoints or ideas at the expense of others."). The regulations advance legitimate governmental interests—aesthetics and traffic safety. *See id.* at 806 ("[M]unicipalities have a weighty, essentially esthetic interest in proscribing intrusive and unpleasant formats for expression."); *Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 507–08 (1981) (plurality) ("Nor can there be substantial doubt that the twin goals that the ordinance seeks to further—traffic safety and the appearance of the city—are substantial governmental goals. It is far too late to contend otherwise.") (footnote omitted); *Railway Express Agency, Inc. v. New York*, 336 U.S. 106, 109 (1949) ("We would be trespassing on one of the most intensely local and specialized of all municipal problems if we held that this regulation had no relation to the traffic problem of New York City."). And the regulations leave open ample alternative communication because they permit billboards that satisfy the height and size restrictions, *see Wheeler*, 822 F.2d at 596, and do "not affect any individual's freedom to exercise the right to speak and to distribute literature in the same place where the posting of signs on public property is prohibited," *Taxpayers for Vincent*, 466 U.S. at 812.

The parties do not dispute any of this. They instead part company over whether the size and height provisions are narrowly tailored. *Ward* goes a long way toward clarifying what the tailoring requirement means in the context of time-place-and-manner scrutiny. In saying that a "narrowly tailored" regulation is one that does not "burden substantially more speech than is necessary to further the government's legitimate interests," 491 U.S. at 799, *Ward* contrasted this time-place-and-manner requirement with the more rigorous tailoring mandated by strict scrutiny.

> Lest any confusion on the point remain, we reaffirm today that a regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate, content-neutral interests but that it need not be the least restrictive or least intrusive means of doing so. Rather, the requirement of narrow tailoring is satisfied so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation. To be sure, this standard does not mean that a time, place, or manner regulation may burden substantially more speech than is necessary to further the government's legitimate interests. Government may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals. *See Frisby v. Schultz*, [487 U.S. 474, 485 (1988)] ("A complete ban can be narrowly tailored but only if each activity within the proscription's scope is an appropriately targeted evil."). So long as the means chosen are not substantially broader than necessary to achieve the government's interest, however, the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative. The validity of time, place, or manner regulations does not turn on a judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests or the degree to which those interests should be promoted.

*Ward*, 491 U.S. at 798–800 (most citations, footnotes and quotation marks omitted).

Words are one thing, of course, their application by the courts another. If "word[s are] known by the company [they] keep[]," *Gutierrez v. Ada*, 528 U.S. 250, 255 (2000), they surely also are known by the actions they prompt. *Ward*, for example, upheld New York City's requirement that a city sound technician control the mixing board during concerts at a bandshell in Central Park. "Absent this requirement, the city's interest would have been served less well . . . . The alternative regulatory methods hypothesized by the Court of Appeals reflect nothing more than a disagreement with the city over how much control of volume is appropriate or how that level of control is to be achieved." *Ward*, 491 U.S. at 800. This reasoning, together with the district court's finding that the city's technician did not interfere with the quality—as opposed to volume—of the sound, sufficed to uphold the requirement. *Id.* at 802. At no point in *Ward* did the Court require the city to justify the particular decibel limits that the city technician imposed by controlling the mixing board.

The Court's sign and billboard cases follow a similar route. In *Taxpayers for Vincent*, the Court upheld a complete ban on posting signs on telephone poles (and their cross-wires), stating that "[t]he District Court found that the signs prohibited by the ordinance do constitute visual clutter and blight. By banning these signs, the City did no more than eliminate the exact source of the evil it sought to remedy." 466 U.S. at 808. The Court distinguished the case from *Schneider v. State*, 308 U.S. 147 (1939), which invalidated a ban on leafletting. Unlike such a rule, which banned protected speech in an effort to prevent the recipients from discarding leaflets on streets after receiving the message, a ban on posting signs on telephone poles and wires was directly related to the evil sought to be averted—the presence of the signs on the poles and wires. *Id.* at 809. Once the Court identified the direct link between the regulation and the interest, it was satisfied that the tailoring prong of time-place-and-manner scrutiny had been established.

In *Gilleo*, the Court invalidated a regulation banning residents from displaying most signs on their property, but not because the law failed the tailoring requirement. Rather, it was because the regulation "almost completely foreclosed a venerable means of communication that is both unique and important. It has totally foreclosed that medium to political, religious, or personal messages." *Gilleo*, 512 U.S. at 54. The Court struck the regulation, in other words, because it was not "persuaded that adequate substitutes exist for the important medium of speech that Ladue has closed off." *Id.* at 56.

Similarly, in *Metromedia*, the Court invalidated San Diego's prohibitions on outdoor advertising not because they failed to satisfy the tailoring requirement but because they were content-based. As to the tailoring requirement, a majority of the Court concluded that the ban directly served the visual-blight and traffic-safety concerns that prompted passage of the ordinance. *See Metromedia*, 453 U.S. at 508 (plurality) ("If the city has a sufficient basis for believing that billboards are traffic hazards and are unattractive, then obviously the most direct and perhaps the only effective approach to solving the problems they create is to prohibit them. The city has gone no further than necessary in seeking to meet its ends. Indeed, it has stopped short of fully accomplishing its ends: It has not prohibited all billboards, but allows onsite advertising and some other specifically exempted signs."); *id.* at 541 (Stevens, J., dissenting in part) (agreeing with the plurality opinion on this point); *id.* at 570 (Rehnquist, J., dissenting) ("In my view, the aesthetic justification alone is sufficient to sustain a total prohibition of billboards within a community."); *see Taxpayers for Vincent*, 466 U.S. at 817 (relying on the above passage from the plurality opinion in *Metromedia* in upholding a billboard regulation).

This court has followed suit in two cases upholding regulations of roadside advertising. *Wheeler* rejected an argument that a ban on certain types of advertising signs was not sufficiently tailored because, by permitting other types of signs, the ban did not completely achieve the interests of aesthetics and traffic safety. Finding that such an incomplete (yet content-neutral) ban

nonetheless directly advanced legitimate interests, the court concluded that the ban satisfied time-place-and-manner scrutiny.  *Wheeler*, 822 F.2d at 595.

*Rzadkowolski v. Village of Lake Orion*, 845 F.2d 653 (6th Cir. 1988), upheld a billboard regulation as sufficiently tailored to achieve the interests of aesthetics and traffic safety even though the regulations banned billboards in all but the small village's one industrial zone.  The court upheld the restrictions because most of the village was residential, and the restrictions "promote[d] significant and legitimate aesthetic interests which enhance property values and psychological well-being for individuals and families.  They may [have] also minimize[d] traffic obstructions and possible visual hazards."  *Id*. at 655.  Without more, this court concluded that the restrictions satisfied time-place-and-manner scrutiny. *Id*.; *see also Valley Outdoor, Inc. v. County of Riverside*, 337 F.3d 1111, 1115 (9th Cir. 2003) (upholding, among other restrictions, a 300-square-foot-size and a 30-foot-height restriction on billboards as valid time-place-and-manner restrictions); *Outdoor Sys., Inc. v. City of Mesa*, 997 F.2d 604, 611 (9th Cir. 1993) (upholding various billboard regulations as valid time-place-and-manner restrictions); *id*. ("[T]he sign codes here go no further than necessary in seeking to accomplish the cities' goals.  Indeed, the cities have stopped short of achieving their goals because they have not banned outdoor signs entirely.") (citations and quotation marks omitted).

Measured by the requirements of these cases, Brentwood's size and height restrictions satisfy the tailoring requirements for a content-neutral regulation of the time, place and manner of speech.  The fit between the City's means and ends is a reasonable one.  The agreed-upon evils of billboards are visual blight and traffic safety.  And the City did not regulate "a possible byproduct" of this problem, *see Taxpayers for Vincent*, 466 U.S. at 810, but the problem itself—"the medium of expression," *id*.  As it was in *Taxpayers for Vincent*, so it is here:  "By banning these signs, the City did no more than eliminate the exact source of the evil it sought to remedy."  *Id*. at 808; *see Metromedia*, 453 U.S. at 508 (plurality) ("If the city has a sufficient basis for believing that billboards are traffic hazards and are unattractive, then obviously the most direct and perhaps the only effective approach to solving the problems they create is to prohibit them.").

Of course, unlike *Taxpayers for Vincent*, where the city banned all signs and billboards on utility poles, Brentwood did not ban all billboards, only those of a certain height and size.  But that does not mean that the City has gone *further* than necessary to satisfy its ends; it means "it has stopped short of fully accomplishing its ends:  It has not prohibited all billboards." *Metromedia*, 453 U.S. at 508 (plurality).  *See Taxpayers for Vincent*, 466 U.S. at 808 n.27 (noting that "a majority of the Court [in *Metromedia*] concluded that a prohibition on billboards was narrowly tailored to the visual evil San Diego sought to correct").  And the height and size restrictions directly advance this interest because billboards that are smaller and shorter are less apt to interfere with aesthetic or traffic safety concerns.

Nor must Brentwood eliminate *all* billboards in order to satisfy the tailoring requirement.  Strange as it may seem, the First Amendment may forbid the regulation of "too much" speech (because the law bans expression unrelated to the governmental interest or leaves inadequate channels of alternative communication) as well as the regulation of "too little" speech (because exemptions to the regulation remove an entire topic of speech from debate, advantage one side of the debate over another or undermine the credibility of the government's explanation for restricting speech at all).  *See Gilleo*, 512 U.S. at 51–52.  But just as the Brentwood ordinance does not prohibit too much speech, it does not restrict too little.  The exemption is not based on content or viewpoint.  And it does not undermine the City's rationale for the regulation because the banned billboards and the permitted billboards are not "equally unattractive." *Taxpayers for Vincent*, 466 U.S. at 811.  A city may fairly prefer smaller objects of visual blight over larger ones.  Plus, "by not extending the ban to all [billboards], a significant opportunity to communicate by" other means is permitted, which generally constitutes a First Amendment virtue rather than vice. *Id*.

While the district court and Prime Media have acknowledged that a least-restrictive-means test does not govern this inquiry, the analysis of the district court on this issue comes perilously close to being just that. *See* D. Ct. Op. at 9–10 ("Defendant does not explain how or why billboards which are six feet high are more [perhaps less] threatening to safe driving or the beauty of Brentwood than billboards which are slightly taller or even much taller. . . . Neither has Defendant shown how or why signs with sign face sizes of more than 120 square feet cause more danger to drivers or detract more from the aesthetics of the City than signs with smaller sign face sizes."). Contrary to this analysis, the question is not whether a municipality can "explain" why a 120-square-foot limitation "detract[s] more from the aesthetics of the City than signs with smaller sign face sizes"; it is whether the regulation is "*substantially broader* than necessary to protect the City's interest in eliminating visual clutter" and advancing traffic safety. *Taxpayers for Vincent*, 466 U.S. at 808 (emphasis added). *Cf. Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 556 (2001) ("[T]he case law requires a reasonable 'fit between the legislature's ends and the means chosen to accomplish those ends.'") (quoting *Bd. of Trs. of State Univ. of New York v. Fox*, 492 U.S. 469, 480 (1989), among other cases). The City has satisfied this more modest test.

Prime Media also errs in making a related point—in arguing that Brentwood failed to provide sufficient evidence to support its regulation and in relying on *Ibanez v. Florida Department Business & Professional Regulation*, 512 U.S. 136 (1994), among other cases, to support this contention. *See id.* at 143 ("Mere speculation or conjecture will not suffice; rather the [government] must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree.") (citations and quotation marks omitted). Brentwood did not merely rely on "speculation or conjecture" in promulgating this ordinance. The "purpose and intent" and "findings" sections of the amended ordinance not only establish that the Brentwood Board of Commissioners considered the costs and benefits of the restriction but also establish that the City determined that the physical restrictions, including the size and height restrictions, "[have] had a positive impact" on Brentwood's stated interests since 1999. JA 510.

Nor is it clear what more a municipality should be required to do after *Taxpayers for Vincent* and *Metromedia*. These cases (and others as well) make it plain that billboard regulations, whatever other strengths and weaknesses they may have, advance a police power interest in curbing community blight and in promoting traffic safety. *See, e.g.*, *Rzadkowolski*, 845 F.2d at 655; *Valley Outdoor*, 337 F.3d at 1115; *Outdoor Sys.*, 997 F.2d at 611; *Wheeler*, 822 F.2d at 595 ("Although the record in the present case contains little evidence regarding Kentucky's interests in traffic safety, we conclude that the interest in promoting the recreational value of public travel and preserving natural beauty along interstate highways is substantial and sufficient to support the content neutral restrictions."). Since no one claims that Brentwood's cited interest in aesthetics is a mere pretext for an ulterior motive, Brentwood deserves reasonable deference with regard to this determination. As the Supreme Court has noted:

> It is not speculative to recognize that billboards by their very nature, wherever located and however constructed, can be perceived as an "esthetic harm." . . . Such esthetic judgments are necessarily subjective, defying objective evaluation, and for that reason must be carefully scrutinized to determine if they are only a public rationalization of an impermissible purpose. But there is no claim in this case that San Diego has as an ulterior motive the suppression of speech, and the judgment involved here is not so unusual as to raise suspicions in itself.

*Metromedia*, 453 U.S. at 510 (plurality). *See id.* at 508 (plurality) (concluding that tailoring requirement was satisfied); *id.* at 541 (Stevens, J., dissenting in part) (joining on this point).

What Prime Media seems to demand is evidence establishing something akin to what the district court required, an explanation of why the regulation limits billboards to less than six feet in

height and 120 square feet in size, as opposed to some greater height or size increment. While Prime Media is right to insist that governments be forced to weigh the costs and benefits of regulating speech and be forced to do so more rigorously than in other areas of legislation, we do not think the Supreme Court's cases (or our own) impose such a stringent duty of calibration—at least in the context of a content-neutral time, place and manner restriction. It is enough here that billboards, all agree, cause visual blight and interfere with traffic safety and that these dimensional restrictions have ameliorated the problems the government sought to address since 1999, when the law went into effect. To ask the City to justify a size restriction of 120 square feet over, say, 200 square feet or 300 square feet would impose great costs on local governments and at any rate would do little to improve our ability to review the law—because any further explanation assuredly would contain the kind of aesthetic and subjective judgment that judges are not well-equipped to second guess. Better, in our view, to save such demanding review for situations where the regulation is not content-neutral, where it does not leave ample alternative channels for communication because it is (or nearly is) a complete ban, or where the "broad sweep of the regulations" themselves show that the government did not reasonably weigh the costs and benefits of regulating speech. *Lorillard*, 533 U.S. at 561. At any rate, this is not such a regulation.

Neither does Prime Media gain traction by invoking the Court's commercial-speech cases. As the Supreme Court has held, the "framework for analyzing regulations of commercial speech [ ] is 'substantially similar' to the test for time, place, and manner restrictions." *Id.* at 554 (quoting *Fox*, 492 U.S. at 477). And the commercial-speech tailoring requirement—a reasonable "'fit' between the legislature's ends and the means chosen to accomplish those ends," *Fox*, 492 U.S. at 480—is a close cousin, if not a fraternal twin, of the test that we have applied here.

B.

Having upheld Brentwood's height and size restrictions on billboards, we must consider Prime Media's damages claim regarding the ban on off-premises billboards. The district court invalidated this provision on the ground that it was content-based (because it favored commercial speech over non-commercial speech) and did not survive scrutiny. The city has amended the ordinance to remove the ban and does not challenge the district court's decision regarding the invalidity of the ban. Nor does Brentwood contend that Prime Media's claim for damages arising from the ban is moot. *See Boag v. MacDougall*, 454 U.S. 364 (1982) (transfer to another prison did not moot prisoner's damages claim arising from placement in earlier prison); *Utah Animal Rights Coalition v. Salt Lake City Corp.*, 371 F.3d 1248, 1257 (10th Cir. 2004) (injunctive relief could no longer redress the injury and the "capable of repetition, yet evading review" doctrine did not apply, but plaintiff's damages claim saved the action from mootness).

Instead, Brentwood challenges Prime Media's continuing ability to satisfy the elements of this damages claim. As the city sees it, Prime Media's application was rejected on three grounds—that it violated the off-premises ban, the height restriction and the size restriction—and each of these grounds independently sufficed to deny the application. Because two of those grounds, it turns out, satisfy the First Amendment's requirements in this area and because all of Prime Media's billboard proposals exceeded the size and height restrictions, Brentwood argues that Prime Media cannot establish that the off-premises ban caused it any injury. We agree. *See Brower v. County of Inyo*, 489 U.S. 593, 599 (1989) (holding that § 1983 claimant must establish "proximate causality" between government's unconstitutional action and injury). In view of Brentwood's permissible rejection of the application on size and height grounds, we agree that Prime Media's claim for actual or nominal damages is flawed as a matter of law. *Cf. Carey v. Piphus*, 435 U.S. 247, 266–67 (1978).

C.

Prime Media, lastly, raises two alternative grounds for affirming the judgment below. It claims that we should address its First Amendment facial challenge to the entire ordinance, including its challenge to numerous provisions of the ordinance that do not affect Prime Media. *See Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973) ("Litigants . . . are permitted to challenge a statute not because their own rights of free expression are violated, but because of a judicial prediction or assumption that the statute's very existence may cause others not before the court to refrain from constitutionally protected speech or expression."). And it claims that we should address its equal-protection challenge to the ordinance. Because the district court did not address either of these claims, we leave it to the district court in the first instance to consider them—as well as Prime Media's standing to raise them—keeping in mind that "a law's application to protected speech [must] be substantial, not only in an absolute sense, but also relative to the scope of the law's plainly legitimate applications, before applying the strong medicine of overbreadth invalidation." *Virginia v. Hicks*, 539 U.S. 113, 119–20 (2003) (citations and quotation marks omitted); *see also Taxpayers for Vincent*, 466 U.S. at 800 ("[T]he mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge."). Because both parties agree that Prime Media is entitled to attorney's fees only if it is a "prevailing party," *Farrar v. Hobby*, 506 U.S. 103, 109 (1992), we leave this issue as well for the district court to determine after considering the remainder of Prime Media's claims.

III.

For these reasons, we reverse and remand for further proceedings consistent with this opinion.