NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a0998n.06

No. 11-3166

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED
*Sep 10, 2012*
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| BENCH BILLBOARD COMPANY, | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| CITY OF TOLEDO, | ) | NORTHERN DISTRICT OF OHIO |
| | ) | |
| Defendant-Appellee. | ) | |
| | ) | |

**BEFORE: SILER, DAUGHTREY, and WHITE, Circuit Judges.**

**HELENE N. WHITE, Circuit Judge.** Plaintiff-Appellant Bench Billboard Company (BBC) appeals the district court's grant of summary judgment in favor of the City of Toledo on BBC's First and Fourteenth Amendment claims challenging provisions of an ordinance regulating "courtesy benches." BBC also appeals the district court's grant of attorneys' fees in an amount lower than requested by BBC. We **AFFIRM in part** and **REVERSE in part**.

**I.**

BBC installs "courtesy benches" that display advertisements on their back-rests on public property adjacent to city streets, particularly at or near bus stops. For many years, the City of Toledo (the City) issued permits for the placement of these benches near bus stops and other rights of way. In 2007, the Toledo City Council enacted Ordinance 59-07 (Ordinance), which amended Chapter 719 of the Toledo Municipal Code (Chapter 719). The ordinance's "Summary and Background" section states:

> The Courtesy Benches are a form of advertising for the bus bench companies, which also provide a needed service for the citizens of Toledo. The current ordinance specifies the permitting and placement of these structures along with some general guidelines but has no language regarding the maintenance, sanitation, and conditions of the permit. It is necessary to add specific provisions to the code in order to better enforce this chapter of the code.

(Ordinance, R. 29-1, at 8.) The ordinance sets forth procedures for the application, issuance, and revocation of permits, and allows the City's Commissioner of Building Inspection and Code Enforcement ("Commissioner") to revoke a permit for a violation of Chapter 719 and various other reasons, including a decision by the Commissioner that the bench is "prejudicial to the interests of the general public."

The ordinance amended Toledo Municipal Code Section 719.08 to add requirements regarding the appearance and placement of the benches. Under Section 719.08(a),

> No bench shall carry any political advertising or advertising of cigarettes, beer or intoxicating liquor, nor shall any advertisement or sign on any such bench display the words, "STOP," "LOOK," "DRIVE-IN," "DANGER," or any other word or words which might mislead or distract traffic.

(*Id.* at 10.) Under Section 719.08(e),

> All bus benches at all locations shall maintain a trash receptacle affixed to the courtesy bench. The receptacle shall be capable of allowing water and other liquids to pass through and shall be no smaller than 10 gallons nor larger than 32 gallons. The permittee is responsible to see that the trash receptacle is emptied on an as needed basis and that the area ten feet in diameter around the bus bench is maintained free of litter and debris.

(*Id.* at 10–11.) Section 719.08(c) requires, in relevant part, that,

> Benches shall be kept at all times in a neat, clean and usable condition and ice, snow, litter and debris shall be removed from the benches and the vicinity thereof in such a manner that each bench shall be accessible at all times.

(*Id.* at 10.)

BBC owns 299 courtesy benches in Toledo. In February 2007, the City wrote letters to BBC and Affordable Bench Advertising Co. (Affordable Bench), another owner of courtesy benches, advising them that bench permits would be regulated under the new ordinance. When BBC sought to renew permits for its benches the following month, the City informed BBC that its benches did not comply with the ordinance and that its permits would not be renewed. The letter also informed BBC that its benches would be "subjected to removal."

Affordable Bench was granted permits for 267 benches, even though some of their benches did not comply with the ordinance because they did not have trash receptacles affixed to them. The Toledo Regional Transit Authority (TARTA), a publicly-owned-and-operated bus service, also places covered shelters containing benches at a number of its bus stops. Those shelters do not contain advertising and are not regulated by Chapter 719.

BBC brought suit against the City, challenging several provisions of the ordinance as violative of BBC's Free Speech and Equal Protection rights under the First and Fourteenth Amendments of the United States Constitution, and bringing a state law claim for tortious interference with economic relationships. After BBC and the City filed cross-motions for summary judgment, the district court granted partial summary judgment for BBC, ruling that the City's prohibition on political speech violated the First Amendment, and that the Commissioner's power to revoke permits for benches deemed "prejudicial to the interest of the general public" was unconstitutionally vague. The district court found that both provisions were severable from the remainder of Chapter 719 and enjoined the City from enforcing those portions of the ordinance. On

BBC's remaining claims, the district court granted summary judgment for the City, ruling that the ordinance's ban on the use of the words "stop," "look," "drive-in," and "danger," and its requirements that trash receptacles be affixed to benches and emptied when necessary, and that benches be cleared of ice, snow, litter, and debris, did not violate BBC's constitutional rights.

BBC then moved for an award of attorneys' fees under 42 U.S.C. § 1988(b), as the prevailing party in a 42 U.S.C. §1983 action. The district court granted that motion, but awarded less than the amount requested by BBC. After the district court granted summary judgment for the City on BBC's remaining claims, BBC timely appealed.

## II.

This Court reviews *de novo* a district court's grant of summary judgment. *ACLU of Ky. v. Grayson Cnty.*, 591 F.3d 837, 843 (6th Cir. 2010). Summary judgment is proper where no genuine dispute of material fact exists and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In reviewing a grant of summary judgment, this Court draws all reasonable inferences in favor of the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

### A.

BBC first argues that the district court erred in concluding that the ban on the use of the words "stop," "look," "drive-in," "danger," and other words that might mislead or distract traffic, did not violate BBC's First Amendment rights.

"Billboards and other visual signs, it is clear, represent a medium of expression that the Free Speech Clause has long protected." *Prime Media, Inc. v. City of Brentwood, Tenn.*, 398 F.3d 814,

-4-

818 (6th Cir. 2005). But unlike oral speech, such signs "take up space and may obstruct views, distract motorists . . . and pose other problems that legitimately call for regulation." *Id.* (citing *City of Ladue v. Gilleo*, 512 U.S. 43, 48 (1994)). The parties agree that the ordinance's ban on certain words on courtesy bench advertisements constitutes a content-based restriction on commercial speech, which is accorded less protection than other constitutionally guaranteed expression. *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 563 (1980). The Supreme Court has set out a four-part inquiry to determine whether such restrictions violate the First Amendment:

> At the outset, we must [(1)] determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least must concern lawful activity and not be misleading. Next, we ask whether [(2)] the asserted governmental interest is substantial. If both inquiries yield positive answers, we must [(3)] determine whether the regulation directly advances the governmental interest asserted, and [(4)] whether it is not more extensive than is necessary to serve that interest.

*Id.* at 566. The City carries the burden of justifying the restriction it seeks to impose. *Edenfield v. Fane*, 507 U.S. 761, 770 (1993) (invalidating as unconstitutional a state rule prohibiting CPA's from engaging in direct, personal solicitation of potential clients). "This burden is not satisfied by mere speculation or conjecture; rather, a governmental body seeking to sustain a restriction on commercial speech must demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Id.* at 770–71.

The parties agree that the speech regulated is lawful and not misleading. BBC concedes that traffic safety is a recognized governmental interest, but argues that the City cannot establish a substantial governmental interest in traffic safety because "it has not regulated signage on and around

its right of ways in a manner that would allow it to assert that the four words prohibited by Section 719.08(a) are more distracting than other signage and therefore unsafe." (BBC Br. at 14.) Further, BBC argues that the ordinance's failure to regulate advertisements on other structures on or abutting its sidewalks, or to regulate advertisements on courtesy benches that do not contain the prohibited words, renders the ordinance so underinclusive that it does not directly advance the City's stated interests.

However, so long as the ordinance directly advances a government's substantial interests and is drawn narrowly, the fact that it is underinclusive does not render the interests insubstantial or the ordinance otherwise violative of the First Amendment. *See Metromedia, Inc. v. City of San Diego*, 453 U.S. 490, 511 (1981) (concluding that a ban on outdoor advertising signs directly advanced the stated objectives of traffic safety and aesthetics, and that fact was not altered because the ordinance exempted "on site" signs that are located at the business being advertised). As the Supreme Court noted in *Metromedia*, a city may believe that certain types of advertising "present[] a more acute problem" than other types of advertising, and may decide that in "limited instance[s] . . . its interests should yield." *Id.* at 511-12.

BBC also argues that the City has not met its burden to "come forward with some quantum of evidence, beyond its own belief in the necessity for regulation, that the harms it seeks to remedy are concrete and that its regulatory regime advances the stated goals." *Pagan v. Fruchey*, 492 F.3d 766, 771 (6th Cir. 2007) (citing *Edenfield*, 507 U.S. at 770-72). In *Pagan*, the ordinance at issue prohibited the parking of vehicles on streets with the purpose of displaying them for sale. *Id.* at 769. The city asserted an interest in traffic safety and aesthetic concerns, but its only evidence that the

regulation directly advanced those goals was the police chief's affidavit containing a "conclusory articulation of governmental interests," which we deemed "simple conjecture" that was "of exactly the type deemed insufficient by the Supreme Court in *Edenfield*." *Id.* at 773. In determining whether the city had carried its burden, we declined an invitation to adopt a standard of "obviousness" or "common sense," instead requiring "*some* evidence to establish that a speech regulation addresses actual harms with some basis in fact." *Id.* at 774 (emphasis in original).

Notably, however, we recognized that such a showing was established in *Metromedia*, where a plurality of the Supreme Court noted the frequency with which local governments had placed—and courts had upheld—restrictions on billboards. *Id.* at 774-75 (citing *Metromedia*, 453 U.S. at 509). Drawing on that history of billboard regulation, the Supreme Court concluded, "[w]e likewise hesitate to disagree with the accumulated, common-sense judgments of local lawmakers and of the many reviewing courts that billboards are real and substantial hazards to traffic safety." *Metromedia*, 453 U.S. at 509. Thus, in the context of outdoor billboard regulation, "*Metromedia* looked to its own substitute for the sort of evidence *Edenfield* requires—the collective judgment of many legislative and judicial decisionmakers." *Pagan*, 492 F.3d at 775.

In *Pagan*, on the other hand, no similar substitute existed to "support[] the conclusion that restrictions placed on 'For Sale' signs posted on vehicles address concrete harms or materially advance a governmental interest." *Id.* BBC contends that this case is like *Pagan* because the City has not offered evidence such as "studies, reports, surveys or even complaints" to establish that the prohibited words are distracting or misleading. (BBC Br. at 16.) The only evidence the City has offered to establish that the ordinance advances its stated goals is the Commissioner's deposition

testimony that he finds the signs distracting.[1]  However, the City argues, and the district court found, that this case is governed by *Metromedia*, because "[t]he rationale—the risk of distracting drivers—for permitting local governments to regulate billboards for traffic safety purposes is the same for bench billboards.  That risk justifies the regulation's prohibition against use of certain words . . . ."  (Order, R. 44, at 18–19.)

The district court correctly concluded that the ordinance in this case is materially indistinguishable from that in *Metromedia*.  In both cases, the statutes seek to regulate outdoor advertisements intended to attract—and distract—the attention of drivers.  That bench billboards are generally much smaller than overhead billboards is of little relevance because they are positioned much closer to passing traffic.  Accordingly, the City met its burden at the third prong of the *Central Hudson* inquiry by relying on the Supreme Court's finding in *Metromedia* that "the accumulated, common-sense judgments" of local lawmakers and reviewing courts have established that "billboards are real and substantial hazards to traffic safety."  453 U.S. at 509.  That finding may substitute for the independent quantum of evidence that the City would otherwise have to put forth to establish that its regulatory regime addresses a concrete harm, *Pagan*, 492 F.3d at 775, and therefore we need not decide whether the City would have met its burden to do so.

---

[1]In response to questions from opposing counsel, Commissioner Zervos testified that he would find each of the prohibited words distracting.  He also testified that, in comparison with other signs that appear along roads generally, "[w]hen one considers that these are on courtesy benches in an urban environment, where traffic is more stop and go as opposed to suburban or rural areas, a distraction in the latter cases is minute, but in an urban area, where bus stops and bus transits are required, they are far more dangerous."  (Zervos Dep., R. 30, at 56–57.)

Under the fourth *Central Hudson* prong, "the relevant question is whether the speech restriction is narrowly tailored; that is, we must determine whether the speech restriction at issue is more extensive than is necessary to serve the asserted interests." *Pagan*, 492 F.3d at 771 (citing *Thompson v. W. States Med. Ctr.*, 535 U.S. 357, 367 (2002) (internal quotation marks omitted)). The tailoring inquiry "does not require a 'least restrictive means' analysis." *Id.* (citing *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 556 (2001)). But there must be a "reasonable fit between the legislature's ends and the means chosen to accomplish those ends, a means narrowly tailored to achieve the desired objective." *Id.* (citing *Lorillard Tobacco*, 533 U.S. at 556 (alteration omitted)).

BBC argues that this prong is not met because the choice of the words "stop," "look," "drive-in," and "danger" is arbitrary and underinclusive. BBC does not argue that the ordinance is overinclusive. As in *Metromedia*, however, the ordinance reflects the City's reasonable decision that bench advertisements containing words that are misleading or distracting present a more acute problem than other kinds of advertisements, and we will not reject that judgment. *Metromedia*, 453 U.S. at 512. The ordinance is "not more extensive than is necessary" to serve the interest of traffic safety. Accordingly, we find that the ordinance's prohibition on the use of the words "stop," "look," "drive-in," "danger," and other words that might mislead or distract traffic on courtesy benches, does not violate BBC's Free Speech rights under the First Amendment.

B.

BBC next challenges as violative of its First Amendment rights the ordinance's requirements that a trash receptacle be affixed to each bench and that the area around each bench be kept free from ice, snow, litter, and debris.

"Time, place, and manner" restrictions such as these "are valid provided [1] that they are justified without reference to the content of the regulated speech, [2] that they are narrowly tailored [3] to serve a significant governmental interest, and [4] that they leave open ample alternative channels for communication of the information." *Prime Media*, 398 F.3d at 818 (citations omitted).[2]

Here, the ordinance's provisions regarding bench maintenance meet this test. BBC does not dispute that the provisions are content-neutral, that the City's asserted interests in ensuring pedestrian safety and aesthetics are significant, *see Metromedia*, 453 U.S. at 507-08, or that the restrictions leave open ample alternative channels for communication of information, *see Prime Media*, 398 F.3d at 819 (holding that billboard regulations "leave open ample alternative communication because they permit billboards that satisfy the height and size restrictions . . . and do not affect any individual's freedom to exercise the right to speak and to distribute literature" in the area regulated).

Finally, a regulation is narrowly tailored if it "promotes a substantial government interest that would be achieved less effectively absent the regulation," and it does not "burden substantially more speech than is necessary to further the government's legitimate interests." *Id.* The government entity "may not regulate expression in such a manner that a substantial portion of the burden on

---

[2]BBC asserts without elaboration or support that the district court should have analyzed the ordinance's bench maintenance regulations under the four-part intermediate scrutiny test under *Central Hudson*, 447 U.S. at 566. However, BBC does not argue that these requirements regulate purely commercial speech of the sort governed by *Central Hudson*. *See Cleveland Area Bd. of Realtors v. City of Euclid*, 88 F.3d 382, 386 (6th Cir. 1996) (*Central Hudson* test is inappropriate for ordinance that applies to both commercial as well as non-commercial speech). In any event, the test for time, place, and manner restrictions is "substantially similar" to the test articulated in *Central Hudson*. *See Prime Media*, 398 F.3d at 824 (citing *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 554 (2001)).

speech does not serve to advance its goals," but "[s]o long as the means chosen are not substantially broader than necessary to achieve the government's interest . . . the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative." *Id.* at 819-20 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 799-800 (1989)).

BBC argues that the City has not pointed to evidence that the courtesy benches are the cause of the litter, ice, or snow. BBC also notes that the City could not quantify the number of complaints that it received from the public regarding litter around the area of the benches. Further, BBC argues that the regulation is underinclusive because the public will continue to litter at TARTA bus shelters and other locations, a harm which the ordinance will not alleviate. Finally, BBC asserts that if it is forced to comply with the ordinance, it will be cost-prohibitive for BBC to continue operating in Toledo, thus rendering the ordinance a *de facto* ban on an entire class of constitutionally-protected speech.

Despite these objections, the district court was correct in finding that the regulations are narrowly tailored. In the absence of the ordinance, the City's interests in ensuring pedestrian safety and litter-free streets would be achieved less effectively. *Prime Media*, 398 F.3d at 819. City officials testified that they received several complaints regarding the condition of courtesy benches and the area around the benches. The fact that the City chose regulations that address its stated interests in some respects and not others does not render the ordinance insufficiently tailored. *See Prime Media*, 398 F.3d at 821 (noting that this Court has previously found that "an incomplete (yet content-neutral) ban nonetheless directly advanced legitimate interests") (citing *Wheeler v. Comm'r*

*of Highways, Com. of Ky.*, 822 F.2d 586, 595 (6th Cir. 1987)). BBC's argument that the ordinance

is effectively a ban on an entire class of constitutionally-protected speech, because BBC would find

it cost-prohibitive to operate under the ordinance, is also unavailing. BBC cites *City of Cincinnati*

*v. Discovery Network, Inc.*, 507 U.S. 410, 430 (1993), for the proposition that "Toledo has basically

enacted an Ordinance that bans "a whole class of Constitutionally-protected speech." (BBC Br. at

24.) However, in that case, Cincinnati ordered the removal of plaintiff's newsracks from sidewalks

under a sweeping ordinance that banned from "any public place" the distribution or sale of

"commercial handbills," defined broadly as any printed or written matter that advertised merchandise

or directed attention to a business or for-profit event. *Id.* at 414. In holding the ordinance

unconstitutional, the Supreme Court, utilizing the standards set forth in *Central Hudson* for content-

based commercial speech, found that the regulation bore "no relationship *whatsoever*" to the asserted

interests of safety and aesthetics. *Id.* at 424. Here, on the other hand, the ordinance is content-

neutral, the regulation is narrowly-tailored to the City's asserted interests, and the ordinance at issue

is not nearly as sweeping as a total ban on written commercial speech in public.[3]

Accordingly, we conclude that the ordinance's requirements that trash receptacles be affixed

to benches and that the area around benches be kept free of ice, snow, litter, and debris, do not

violate BBC's First Amendment rights.

---

[3]BBC cites no authority for the proposition that its own inability to operate profitably under the ordinance renders the ordinance a *de facto* ban on an entire class of constitutionally-protected speech of the sort addressed in *Discovery Network*, 507 U.S. at 430. Nor does the record show that the ordinance is so burdensome as to render courtesy benches impossible to provide, as at least one other company, Affordable Bench, has begun complying with the ordinance by attaching trash receptacles to its benches.

C.

BBC argues that the ordinance violates its Equal Protection rights by treating BBC benches differently than benches at TARTA bus shelters and newsracks allowed on the City's sidewalks, neither of which are covered by the ordinance. Further, BBC argues that the law is being enforced differently with respect to benches owned by another courtesy bench company, Affordable Bench.

The Equal Protection Clause prohibits states from making distinctions that either (1) burden a fundamental right, (2) target a suspect classification, or (3) intentionally treat one differently from others similarly situated without any rational basis for the difference. *Radvansky v. City of Olmsted Falls*, 395 F.3d 291, 312 (6th Cir. 2005). Where, as here, a plaintiff proceeds under the third theory, it must prove that it has been treated differently from similarly-situated individuals, and that the government's actions lacked any rational basis. *See Club Italia Soccer & Sports Org. Inc. v. Charter Twp. of Shelby, Michigan*, 470 F.3d 286, 298 (6th Cir. 2006), *overruled on other grounds as recognized by Davis v. Prison Health Servs.*, 679 F.3d 433 (6th Cir. 2012).

To establish that it was treated differently from similarly situated entities, BBC must demonstrate that it and the entities who were treated differently were similarly situated in all material respects. *See TriHealth, Inc. v. Bd. of Comm'rs, Hamilton Cnty., Ohio*, 430 F.3d 783, 789–90 (6th Cir. 2005). The district court correctly found that BBC is similarly situated to other courtesy bench companies and to TARTA,[4] but not to newsracks, because unlike newsracks, the others provide

---

[4]BBC incorrectly asserts that the district court found that TARTA and BBC were not similarly situated. In fact, the district court held that they were similarly situated, but that the City's decision to treat TARTA and BBC differently had a rational basis. (*See* Order, R. 44, at 26.)

"location[s] where people congregate while waiting for the bus, thereby potentially increasing the amount of litter present." (Order, R. 44, at 24.) In claiming that the district court erred in refusing to find BBC similarly situated to providers of newsracks, BBC argues that the "similarly situated" inquiry should refer to the form of advertising rather than the entities that own them. However, nothing in the district court's reasoning suggests that it examined only the characteristics of the owners of the advertising to the exclusion of the form of advertising. On the contrary, the district court's reasoning suggests that it took into account both the location and the form of advertising in determining that newsracks and benches, and thus the entities that place each in the public right of way, are not similarly situated for purposes of the Equal Protection Clause.

Under rational basis review, despite differential treatment of BBC and similarly situated entities, the regulation must be sustained "if *any* conceivable basis rationally supports it." *TriHealth*, 430 F.3d at 790. A defendant "need not offer any rational basis so long as this Court can conceive of one." *Club Italia Soccer & Sports Org.*, 470 F.3d at 299.

The City asserts that the ordinance treats TARTA differently from BBC because the former is a taxpayer-funded public transportation system that incidentally provides benches at its bus stops for the benefit of its riders, whereas BBC is a for-profit advertising company. The district court correctly concluded that a rational basis exists for the differential treatment because, "[g]iven the importance of low-cost public transportation, the city rationally can impose lesser restrictions on the public operator of its transit system than on others not in the business of providing a similarly essential public service." (Order, R. 44, at 26–27.)

Further, a rational basis existed to issue permits to Affordable Bench because, unlike BBC, it had begun to comply with the ordinance by attaching trash receptacles to its benches. Although incomplete, Affordable Bench's efforts at compliance provide a rational basis for the City's differential treatment of Affordable Bench and BBC. Accordingly, BBC cannot establish an equal protection violation.

### III. Attorneys' Fees

BBC claims that, in reducing its initial request for $132,532 in attorneys' fees, the district court erred in: (1) reducing attorneys' fees based on the litigation's partial success, (2) reducing attorneys' fees based on the unreasonableness of BBC's quarter-hour billing increments, and (3) reducing the fee award based on one attorney's affidavit describing his firm's assistance on the federal matter as "minimal." (BBC Br. at 29–32.) This Court reviews a district court's award of attorneys' fees under 42 U.S.C. § 1988 for an abuse of discretion. *Sensations, Inc. v. City of Grand Rapids*, 526 F.3d 291, 302 (6th Cir. 2008).

A. Partial Success

Where "a plaintiff has achieved only partial or limited success, the product of hours reasonably expended on the litigation as a whole times a reasonable hourly rate may be an excessive amount." *Hensley v. Eckerhart*, 461 U.S. 424, 436 (1983). However, a court should not reduce attorney fees "based on a simple ratio of successful claims to claims raised." *Thurman v. Yellow Freight Sys., Inc.*, 90 F.3d 1160, 1169 (6th Cir. 1996). Where a plaintiff's claims for relief involve a common core of facts or are based on related legal theories, the lawsuit "cannot be viewed as a

series of discrete claims. Instead the district court should focus on the significance of the overall relief obtained by the plaintiff." *Hensley*, 461 U.S. at 435.

Here, BBC alleged three First Amendment violations, an Equal Protection claim, and a state-law claim for tortious interference with economic relationships, and prevailed on two First Amendment claims. Those claims were not all based on the same legal theories, as some of the provisions of the ordinance that BBC sought to strike down were upheld, while others were struck down. The district court accordingly found that BBC "received a 'good' but not an 'excellent' result in its § 1983 claims." (Order, R. 64, at 12.) Taking into account BBC's limited success and the fact that the unconstitutional provisions were severable, the district court decided to reduce the attorney fee award by 25% to reflect partial success. In making such a finding, we conclude that the district court did not abuse its discretion.

B. Billing Increments

Although the City did not raise the issue with the district court, the district court made a further reduction in the attorneys' fees award on the basis that BBC's counsel, Mr. Holzapfel, kept his time records in quarter-hour increments, including for tasks that the district court believed were unlikely to occupy a full fifteen minutes of his time. BBC argues that the district court erroneously held that quarter-hour timekeeping is *per se* unreasonable. However, the district court noted that some courts have suggested billing in quarter-hour increments is not *per se* unreasonable, but nevertheless found such billing inappropriate in a § 1983 case because of its tendency to generate bills that are fifteen percent higher than bills based on tenth-of-an-hour billing increments. Accordingly, the district court split the difference and reduced counsel's hours by 7.5 percent.

Because "[i]t remains for the district court to determine what fee is 'reasonable,'" *Hensley*, 461 U.S. at 433, and the district court has discretion to reduce an award of fees "where the documentation of hours is inadequate," *id.*, the district court did not abuse its discretion in reducing the attorneys' fees awarded on the basis of quarter-hour billing increments.

C. Fees of Toledo Counsel

Finally, BBC asserts that the district court improperly eliminated 13.80 hours of attorneys' fees generated by local counsel Mr. Heywood by misconstruing his affidavit to conclude that those hours were not related to instant action. The City does not respond to or dispute this claim on appeal. Accordingly, we reverse the district court's reduction of attorneys' fees with respect to the 13.80 hours billed by local counsel Heywood.

**IV. Conclusion**

For the foregoing reasons, we **AFFIRM in part and REVERSE in part** the judgment of the district court.