RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 15a0063p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

PLANET AID, a Massachusetts nonprofit corporation,
                                    *Plaintiff-Appellee*,

        *v.*

CITY OF ST. JOHNS, MI, a Michigan municipal corporation,

                                    *Defendant-Appellant*.

No. 14-1680

———————————

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids
No. 1:14-cv-00149—Janet T. Neff, District Judge.

Argued:  March 5, 2015

Decided and Filed:  April 6, 2015

Before:  GRIFFIN and STRANCH, Circuit Judges; and STEEH, District Judge.[*]

———————————

## COUNSEL

**ARGUED:**  Mary Massaron, PLUNKETT COONEY, Bloomfield Hills, Michigan, for Appellant.  Daniel P. Dalton, DALTON & TOMICH, PLC, Detroit, Michigan, for Appellee.  **ON BRIEF:**  Mary Massaron, PLUNKETT COONEY, Bloomfield Hills, Michigan, for Appellant.  Daniel P. Dalton, DALTON & TOMICH, PLC, Detroit, Michigan, for Appellee.

———————————

## OPINION

———————————

GRIFFIN, Circuit Judge.  In this First Amendment case, defendant City of St. Johns, Michigan appeals the district court's order preliminarily enjoining the enforcement of the City's

—————————————————

[*]The Honorable George Caram Steeh, Senior United States District Judge for the Eastern District of Michigan, sitting by designation.

Ordinance #618 which bans outdoor, unattended charitable donation bins.  We hold that the ordinance is a content-based regulation of protected speech, and that Planet Aid has demonstrated a strong likelihood of success on the merits of its constitutional claim.  Accordingly, and for the reasons that follow, we affirm the district court's preliminary injunction.

I.

Plaintiff Planet Aid is a nonprofit charitable organization established in Massachusetts.  Its purpose is to "work to strengthen and organize communities, reduce poverty and promote small enterprise development, support sustainable local food production, improve access to training and quality education, and increase health awareness and encourage healthy lifestyles."  To that end, Planet Aid solicits donations of clothing and shoes through its unattended, outdoor donation bins.  Planet Aid distributes the items collected from the bins to organizations in other countries.

With the consent of the property owners, Planet Aid places its donation bins on the property of private businesses.  It chooses locations that are "easily visible and accessible by individuals looking to deposit donations in the bins."  According to Planet Aid, its "representatives generally visit each of its donation bins on a weekly basis in order to collect the donated goods and avoid bin overflow and goods accumulating outside the bins."  Its bins are labeled with contact information so members of the public can report to Planet Aid if the bins are full.

In December 2012, the City did not have an ordinance regulating charitable donation bins.  At that time, Planet Aid placed two of its donation bins on private property within the City: one at a former Save-a-Lot grocery store at 1001 S. BR US Highway 27, and the other at a Marathon gas station at 711 West State Street.

On January 14, 2013, the City sent Planet Aid a letter claiming that the "clothing donation containers have been found to create a nuisance as people leave boxes and other refuse around the containers."  It directed Planet Aid to remove the bins by January 23.  The letter stated further that if the bins were not removed by January 23, the City would remove them.

In response to the letter, Planet Aid's attorney, Dan Dalton, emailed the City's attorney, John Salemi.  Dalton asked Salemi whether Planet Aid could "retain its boxes in St. Johns' [sic] until the matter appears for ordinance review before the planning commission/City Council."  Salemi replied that he would discuss the request with City officials and get back to Dalton.  On January 18, 2013, Dalton again emailed Salemi inquiring whether City officials had made a decision and asking whether the bins "are to be removed by the 23rd . . . or if they can stay until an ordinance is enacted addressing the issue?"  Salemi responded that "the city manager is firm in his belief that these boxes are both a public nuisance and a violation of our zoning ordinances re [sic] accessory uses.  They need to be removed."  In answer to Dalton's question of whether there was an appeals process, Salemi replied that Planet Aid would not "have standing to appeal even if there were" because the bins "aren't on [Planet Aid's] property."  The City subsequently removed the bins and transported them to a City facility where they were later collected by Planet Aid.

Almost a year later, the City Council addressed the issue of regulating charitable donation bins at its December 9, 2013, meeting.  According to the minutes, the planning commission had recommended a "total prohibition" of charitable donation bins.  The proposed ordinance (Ordinance #618) implemented this recommendation, but included a grandfather clause because, according to Salemi, the City wished to exempt the already-operational Lions Club Recycling Center from any new regulation.  At the meeting, Mayor Beaman "said other communities had people dropping off their trash" at donation bins and asked the Director of Public Works, Steve Rademacher, whether there was a problem with the St. Johns Planet Aid bins.  Rademacher responded that trash drop offs at the two bins had "very seldom" occurred.

Nevertheless, the St. Johns City Council voted to adopt Ordinance #618 at its January 27, 2014, meeting.  The ordinance added a new article, Article 5.518, to the St. Johns Zoning Ordinance.

Section 5.518(1)(a) of the ordinance defines a "[d]onation box" as "[a]n outdoor, unattended receptacle designed with a door, slot, or other opening that is intended to accept donated goods or items."  Section 5.518(1)(b) describes the purpose of the ordinance as follows:

It is the intent of this section to prohibit donation boxes to protect the health, safety and welfare of the citizens of the city by preventing blight, protecting property values and neighborhood integrity, avoiding the creation and maintenance of nuisances and ensuring the safe and sanitary maintenance of properties. Unattended donation boxes in the city may become an attractive nuisance for minors and/or criminal activity. It is also the intent of this section to preserve the aesthetics and character of the community by prohibiting the placement of donation boxes.

The following sections contain a substantive prohibition: "No person, business or other entity shall place, use or allow the installation of a donation box within the City of St. Johns." (5.518(1)(c)) and a grandfather clause: "A donation box that exists on the effective date of this ordinance shall not be subject to the prohibition contained herein." (5.518(1)(d)).

On February 14, 2014, Planet Aid filed a five-count complaint in the district court, alleging, among other things, that Ordinance #618 violated Planet Aid's First Amendment rights because it infringed on Planet Aid's protected speech of charitable solicitation and giving.[1] The complaint sought both declaratory and injunctive relief. The City answered the complaint, denying liability.

Planet Aid also filed a motion for a temporary restraining order or a preliminary injunction. The district court's order granting plaintiff's motion is the subject of this appeal.

In the district court and on appeal, Planet Aid argued that its speech regarding charitable giving is protected by the First Amendment and that the ordinance is a content-based restriction subject to strict scrutiny. In opposing the motion and in this appeal, the City conceded a level of First Amendment protection regarding Planet Aid's speech, but argued that Planet Aid's bins are analogous to outdoor advertising signs, and that Ordinance #618 is therefore a content-neutral time, place, and manner restriction that passes constitutional muster.

After holding oral argument, the district court granted plaintiff's motion for a preliminary injunction. The district court concluded that "Planet Aid's operation of donation bins to solicit

---

[1]The other four counts of the complaint alleged violations of Planet Aid's rights under the Equal Protection and Due Process clauses of the Fourteenth Amendment, the Dormant Commerce Clause, and the Michigan Constitution. Only Planet Aid's claim as to its First Amendment rights is at issue in this appeal.

and collect charitable donations qualifies as protected speech under the First Amendment" and that Ordinance #618 was subject to strict scrutiny.  The court held that

> Plaintiff, in arguing that the ordinance fails strict scrutiny because it implements an overly broad, prophylactic ban on all bins so the City can avoid dealing with hypothetical nuisances or other issues that may arise with certain bins in the future, has borne its burden of proving a substantial likelihood of succeeding on the merits of its free speech claim.

The City appeals.

## II.

In reviewing a district court's decision on a motion for a preliminary injunction, we "evaluate the same four factors that the district court does:  (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction." *Kentucky v. U.S. ex rel. Hagel*, 759 F.3d 588, 600 (6th Cir. 2014) (internal quotation marks omitted).

We review "the District Court's legal rulings *de novo* (including its First Amendment conclusion), and its ultimate conclusion [regarding whether to issue a preliminary injunction] for abuse of discretion." *Platt v. Bd. of Comm'rs on Grievances & Discipline of Ohio Supreme Court*, 769 F.3d 447, 454 (6th Cir. 2014) (internal quotation marks omitted).  Findings of fact are reviewed for clear error. *N.A.A.C.P. v. City of Mansfield, Ohio*, 866 F.2d 162, 166 (6th Cir. 1989); *see also City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (en banc) (also noting that we review "for abuse of discretion, however, the district court's ultimate determination as to whether the four preliminary injunction factors weigh in favor of granting or denying preliminary injunctive relief.").  In other words, "when we look at likelihood of success on the merits, we independently apply the Constitution, but we still defer to the district court's overall balancing of the four preliminary-injunction factors." *Platt*, 769 F.3d at 454.

III.

In this case, as the parties agree, the determination of whether Planet Aid is likely to succeed on the merits of its First Amendment claim controls the question of the validity of the preliminary injunction. *See Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998). We therefore turn to the merits of Planet Aid's First Amendment claim.

The Supreme Court previously addressed charitable giving and the related act of charitable solicitation in *Village of Schaumburg v. Citizens for a Better Environment*, 444 U.S. 620 (1980). There, the Court invalidated an ordinance that prohibited charities from soliciting contributions unless the charities used at least seventy-five percent of their receipts "directly for the charitable purpose of the organization." *Id*. at 624. The Supreme Court held that "charitable solicitations" were "clear[ly]" protected by the First Amendment, *id*. at 633, noting that its "'cases long have protected speech even though it is in the form of . . . a solicitation.'" *Id*. (quoting *Bates v. State Bar of Ariz.*, 433 U.S. 350, 363 (1977) (omission in original)). It emphasized the "reality that solicitation is characteristically intertwined with informative and perhaps persuasive speech seeking support for particular causes or for particular views on economic, political, or social issues, and . . . the reality that without solicitation the flow of such information and advocacy would likely cease." *Id*. at 632. The *Schaumburg* Court applied strict scrutiny, holding that the ordinance could not be sustained unless it served a "sufficiently strong, subordinating" government interest. *Id*. at 636. Although the Court found that the village's stated reason for passing the ordinance—fraud prevention—was substantial, it observed that the ordinance "only peripherally" served that interest because an organization could use more than twenty-five percent of its receipts for purposes other than its charitable mission and yet remain a charitable organization. *Id*. at 636–37. Later, the Supreme Court reaffirmed that speech regarding charitable giving and solicitation is a protected First Amendment activity in both *Secretary of State of Maryland v. Munson*, 467 U.S. 947 (1984), and *Riley v. National Federation of the Blind of North Carolina, Inc.*, 487 U.S. 781 (1988). Again, the Court applied strict scrutiny to regulations similar to the one at issue in *Schaumburg*. *See also Speet v. Schuette*, 726 F.3d 867, 874 (6th Cir. 2013) (holding that "the First Amendment [not only]

protects charitable solicitation performed by organizations" but also protects "the solicitation of alms when performed by an individual not affiliated with a group").

The Supreme Court has "created a rough hierarchy in the constitutional protection of speech" with "[c]ore political speech" occupying "the highest, most protected position . . . commercial speech and nonobscene, sexually explicit speech" occupying a "sort of second-class" status, and "obscenity and fighting words" receiving "the least protection of all." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 422 (1992) (Stevens, J., dissenting); *see also Snyder v. Phelps*, 131 S. Ct. 1207, 1215 (2011) (acknowledging the "hierarchy of First Amendment values"); Paul B. Stephan III, *The First Amendment and Content Discrimination*, 68 Va. L. Rev. 203, 206 (1982) ("The approach reflected in the Court's free speech opinions, and in almost every scholarly discussion of the first amendment, posits some hierarchy of values entitled to constitutional protection. Such a hierarchy implies a . . . ranking of particular categories of expression, according to the degree the expression implicates the underlying values."). *Schaumburg* and its progeny hold that speech related to charitable solicitation and giving is worthy of strong constitutional protection. *Compare Snyder*, 131 S. Ct. at 1215 ("[S]peech on public issues occupies the highest rung of the hierarchy of First Amendment values." (internal quotation marks omitted)), *with Schaumburg*, 444 U.S. at 632 (noting that charitable appeals "involve a variety of speech interests [including] communication of information, the dissemination and propagation of views and ideas, and the advocacy of causes," as well as "informative and perhaps persuasive speech seeking support for . . . particular views on economic, political, or social issues"), *and Riley*, 487 U.S. at 796 (holding that even assuming, arguendo, that charitable solicitations were "in the abstract . . . merely 'commercial,' we do not believe that the speech retains its commercial character when it is inextricably intertwined with . . . fully protected speech" on issues of public importance such as those described in *Schaumburg*, and therefore declining to "separate the component parts of charitable solicitations from the fully protected whole").

Although the Supreme Court has not addressed the status of unattended donation bins, the Fifth Circuit has. In *National Federation of the Blind of Texas, Inc. v. Abbott*, 647 F.3d 202 (5th Cir. 2011), the Court of Appeals for the Fifth Circuit relied on *Schaumburg* when invalidating a Texas law requiring groups operating "public donations receptacles" to make disclosures on the

donation receptacles indicating, essentially, whether donated items would be sold for profit. Texas argued that *Schaumburg* and its progeny were distinguishable because, unlike the active, in-person solicitation at issue in *Schaumburg*, donation bins "represent nothing more than an upturned palm" and were thus not expressive and protected the way that active, person-to-person solicitations are. *Id.* at 212. Our sister circuit disagreed, reasoning that

> *Schaumburg*'s mention of "on the street or door to door" solicitations is reflective of the statute at issue in that case, not a meaningful ground on which to distinguish donations to public receptacles. Black's law dictionary defines solicitation as "[t]he act or an instance of requesting or seeking to obtain something." Black's Law Dictionary 1520 (9th ed. 2009). Solicitation is not limited to in-person communication. More importantly the speech interests identified in *Schaumburg*—"communication of information, the dissemination and propagation of views and ideas, and the advocacy of causes"—are surely implicated by the public receptacles. The mere inclusion of the name of a charity on a donation box communicates information about the beneficiary of the benevolence and explicitly advocates for the donation of clothing and household goods to that particular charity. At a minimum, the donation boxes implicitly advocate for that charity's views, ideas, goals, causes, and values. It is clear that Texans have choices when choosing to dispose of unwanted clothing or household goods.

*Id.* at 212–13. The court held that "public receptacles are not mere collection points for unwanted items, but are rather silent solicitors and advocates for particular charitable causes." *Id.* at 213. We agree.

The Fifth Circuit's rationale in *Abbott* is well-reasoned and consistent with the free speech principles set forth in *Schaumburg* and its progeny. A charitable donation bin can—and does—"speak," and not only in the ways described by the Fifth Circuit in *Abbott*. A passer-by who sees a donation bin may be motivated by it to research the charity to decide if he wants to donate—in so doing, the passer-by will gain new information about the social problem the charity seeks to remedy. Indeed, the donation bin may ultimately motivate citizens to donate clothing or shoes even if they had not previously considered doing so. The speech may not be unidirectional, either—a citizen faced with a choice among several bins from different charities may be inspired to learn more about each charity's mission in deciding which charity is consistent with his values, thus influencing his donation decision. In this way, donation bins in

many respects mirror the passive speaker on the side of the road, holding a sign drawing attention to his cause.

For these reasons, we hold that speech regarding charitable giving and solicitation is entitled to strong constitutional protection, and the fact that such speech may take the form of a donation bin does not reduce the level of its protection. These conclusions, however, are the beginning of our inquiry, not the end of it. That is because the fact that a government regulation may incidentally impact some protected speech does not automatically trigger strict scrutiny. *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989). Government regulations of protected speech are subject to strict scrutiny only if they target the protected speech, that is, if they are content-based. With this in mind, we turn to the next step of our analysis.

IV.

A.

Determining whether Ordinance #618 is content-based is critical because the content status of a regulation dictates the level of scrutiny applied to it. Broadly speaking, content-based regulations on protected speech "can stand only if [they] satisf[y] strict scrutiny." *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 811 (2000). By contrast, government action that merely regulates the time, place, and manner of protected speech, that is, "regulations that are unrelated to the content of speech[,] are subject to an intermediate level of scrutiny." *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 642 (1994).

Determining whether a particular regulation is content-based or content-neutral "is not always a simple task." *Id.* Generally, however, if a law "treats speech differently based on the viewpoint or subject matter of the speech, on the words the speech contains, or on the facts it conveys, the [law] is based on the content (and the communicative impact) of speech." Eugene Volokh, THE FIRST AMENDMENT AND RELATED STATUTES 360 (5th ed. 2014). By contrast, if a law "focuses on the noncommunicative aspects of the speech, and treats speech the same regardless of what the speech says, [the law is] content-neutral." *Id.*

"The First Amendment's hostility to content-based regulation extends not only to restrictions on particular viewpoints, but also to prohibition of public discussion of an entire

topic." *Consol. Edison Co. of N.Y. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 530, 537 (1980); *see also Carey v. Brown*, 447 U.S. 455, 462 n.6 (1980) ("It is . . . no answer to assert that the . . . [speech regulation at issue] does not discriminate on the basis of the speaker's viewpoint, but only on the basis of the subject matter of his message."). Indeed, "a law *may be content-based even if it's viewpoint-neutral.* A ban on profanity, for instance, is viewpoint-neutral, but content-based. Speech restrictions [thus] fall into three categories: (1) content-neutral (and therefore viewpoint-neutral), (2) content-based but viewpoint-neutral, and (3) viewpoint-based (and therefore content-based)." Volokh, THE FIRST AMENDMENT at 361.

The Supreme Court has analyzed the content status of speech regulations in a number of ways. First, the Court has held that whether a regulation is content-based or content-neutral may turn on whether "the government has adopted a regulation of speech because of disagreement with the message it contains." *Hill v. Colorado*, 530 U.S. 703, 719 (2000) (quoting *Ward*, 491 U.S. at 791). That is, if the regulation engages in viewpoint discrimination, it is content-based. *Turner*, 512 U.S. at 643 ("As a general rule, laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content based.").

Second, the Court has held that the content-neutral/content-based distinction may turn on whether the regulation hampers the "communicative impact of [the speaker's] expressive conduct." *Texas v. Johnson*, 491 U.S. 397, 411 (1989). That is, a regulation is content-neutral only if it is "unrelated to expression." *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 567 (2001).

Third, a court should examine whether the legislature's predominant intent regarded the content of the speech, rather than its secondary effects. *Renton v. Playtime Theaters, Inc.*, 475 U.S. 41, 48 (1986).

Fourth, and most obviously, the Supreme Court has held that when a regulation is "based on the content of speech" and not "applicable to all speech irrespective of content," the regulation is content-based. *Consol. Edison Co.*, 447 U.S. at 536. That is, when a regulation "regulates speech on the basis of its subject matter," it is not content-neutral. *Id.*

Employing one or more of these standards, the Supreme Court has ruled that the following are content-based:  federal and state regulations prohibiting or restricting the burning of flags as a form of protest, *United States v. Eichman*, 496 U.S. 310, 315 (1990), *Johnson*, 491 U.S. at 412; a city regulation prohibiting the display of signs within 500 feet of a foreign embassy that "tend[] to bring that foreign government into 'public odium' or 'public disrepute,'" *Boos v. Barry*, 485 U.S. 312, 315, 321 (1988); a federal criminal statute proscribing the posting for commercial purposes content that was "harmful to minors," including sexually explicit content, *Ashcroft v. ACLU*, 542 U.S. 656, 661 (2004); a federal statute requiring that cable operators scramble only sexually explicit channels but not others, thus "focus[ing] *only* on the content of the speech and the direct impact that speech has on its listeners," *Playboy Entm't Grp., Inc.*, 529 U.S. at 811 (quoting *Boos*, 485 U.S. at 321 (opinion of O'Connor, J.)); a state provision prohibiting candidates for judgeships from announcing their views on political issues, *Republican Party of Minn. v. White*, 536 U.S. 765, 774 (2002); a state statute prohibiting criminals from receiving financial compensation from writings about their crimes because the statute "single[d] out income derived from expressive activity for a burden the State place[d] on no other income, and it [was] directed at works with a specified content," *Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.*, 502 U.S. 105, 116 (1991); a regulation charging those organizing a parade for policing expenses, but which could be adjusted by the government based on need and therefore amounted to a "premium in the case of a controversial political message delivered before a hostile audience," *Forsyth Cnty. v. Nationalist Movement*, 505 U.S. 123, 136 (1992); and a law banning all residential picketing except labor picketing, because "the permissibility of residential picketing under the . . . statute [was] . . . dependent solely on the nature of the message being conveyed," *Carey*, 447 U.S. at 461.  Even though several of these examples involve *viewpoint*-neutral regulations, they are all *content*-based.  *See* Volokh, THE FIRST AMENDMENT at 360.

By contrast, the Supreme Court has concluded that regulations such as the following are content-neutral:  a ban on all sleeping in public parks, *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 295 (1984); a city's "attempt to regulate the volume of amplified music at [a] bandshell," *Ward*, 491 U.S. at 784, 792; a ban on the "proliferation of an unlimited number of signs in private, residential, commercial, industrial, and public areas . . . [because signs] would

create ugliness, [as well as] visual blight and clutter," *City of Ladue v. Gilleo*, 512 U.S. 43, 47 (1994);**2** a ban on all sound amplification devices, *Kovacs v. Cooper*, 336 U.S. 77, 87 (1949); a ban on all public nudity, "regardless of whether that nudity is accompanied by expressive activity," *City of Erie v. Pap's A.M.*, 529 U.S. 277, 290 (2000); and a ban on the distribution of leaflets, handbills, and "oral protest" within 100 feet of a health care facility because the ban "place[d] no restrictions on . . . any subject matter that may be discussed by the speaker" but instead "establishe[d] a minor place restriction on an extremely broad category of communications with unwilling listeners," *Hill*, 530 U.S. at 708, 723.

B.

Under these standards, Ordinance #618 clearly regulates protected speech on the basis of its content. The ordinance does not ban or regulate all unattended, outdoor receptacles. It bans only those unattended, outdoor receptacles with an expressive message on a particular topic—charitable solicitation and giving. Thus, the ordinance is not "unrelated to expression." *Lorillard Tobacco Co.*, 533 U.S. at 567. The ordinance's "purpose clause" lists a plethora of problems associated with donation bins, including concerns over "preserv[ing] aesthetics," "preventing blight," and "avoiding the creation and maintenance of nuisances." The City elaborates in its appellant brief, arguing that donation bins "can readily be surrounded by items that don't fit or that overflowed [sic] because the bin was [sic] full," and that "children can be injured by climbing into or on such bins; and they have become a place for criminals loitering in some communities." However, these concerns apply with equal force to non-expressive outdoor receptacles such as dumpsters, receptacles at recycling centers, and public and private trash cans. Yet the ordinance permits the "place[ment], use [and] . . . installation" of these non-expressive receptacles. It bans only those outdoor receptacles that are "intended to accept donated goods or items." That is, Ordinance #618 bans only outdoor receptacles that carry a message about charitable giving—expression that the Supreme Court held in *Schaumburg* and its progeny is worthy of strong constitutional protection.

---

**2**In *Ladue*, the Court assumed, without squarely deciding, that the ordinance was content-neutral, but struck it down anyway because it failed intermediate scrutiny by not leaving open sufficient "alternative channels for communication." *Ladue*, 512 U.S. at 56 (citation omitted).

The City asserts that Ordinance #618 is content-neutral. Underpinning its argument is its assumption that because the ordinance is viewpoint-neutral, it is also content-neutral. For example, the City argued in its briefing that Ordinance #618 is content-neutral because it "makes no distinction based on the nature of the organization, person, or entity that sought to place a donation box within the City." At oral argument, the City elaborated that the ordinance is content-neutral because it applies "to donation bins regardless of whose they are." However, as we explained above, a speech regulation can be viewpoint-neutral but content-based. For example, the regulation at issue in *White* prevented judicial candidates from expressing a point of view—any point of view—on "disputed legal or political issues." 536 U.S. at 768. It was thus viewpoint-neutral, but the Supreme Court still held that it was content-based and invalidated it. *Id*. at 774, 788. Thus, it does not follow that the ordinance is content-neutral simply because it is viewpoint-neutral.

In a related argument, the City quotes the Supreme Court's pronouncement in *Ward* that "[t]he government's purpose is the controlling consideration" in determining content-status of a regulation and asserts that the government's purpose in this case is "set forth in the ordinance itself." Specifically, the City argues that because the ordinance's "purpose clause" lists a number of non-speech-based justifications for the ordinance (prevention of blight, aesthetics, etc.), the ordinance is necessarily content-neutral. However, the "purpose clause" of the ordinance does not alter the fact that the ordinance is facially content-based. The ordinance applies only to outdoor, unattended receptacles that are "intended to accept donated goods or items." In other words, by its terms, the ordinance applies only to one subclass of unattended, outdoor receptacles: those with a message about charitable solicitation and giving. Thus, it is clear from the face of the ordinance that the City's purpose in enacting it was to regulate speech on the basis of its content.

The City also contends that plaintiff's charitable donation bins are "analogous to billboards and advertising signs" because both donation bins and signs are "physical object[s] that [are] placed outside on property within [a] city." It relies on cases in which our court has held that regulations of billboards and signs are content-neutral. *See Bench Billboard Co. v. City*

*of Covington*, 465 F. App'x 395, 403–05 (6th Cir. 2012), *and Prime Media, Inc. v. City of Brentwood*, 398 F.3d 814, 818–24 (6th Cir. 2004). This argument is not persuasive.

The regulations at issue in *Bench Billboard Co.* and *Prime Media* were not content-neutral simply because they regulated physical, outdoor structures. Rather, the regulations were deemed content-neutral because they did not proscribe the speech content that could be placed on the billboards or signs. *See Prime Media*, 398 F.3d at 816, 819 (noting that the case involved a challenge to an ordinance "that restricts the size and height of billboards" and holding that the ordinance was content-neutral because it "regulate[d] only the non-expressive components of billboards"); *Bench Billboard Co.*, 465 F. App'x at 403 (addressing an ordinance that regulated the height, width, and depth of newsracks on public property and governing where they could be located).

A government may regulate the physical characteristics of outdoor structures, *provided the regulations are content-neutral*. However, that is not what occurred here. The ordinance at issue does not merely regulate outdoor structures' height, size, cleanliness, or where they may be located. On the contrary, it bans altogether an entire subclass of physical, outdoor objects—those with an expressive message protected by the First Amendment. That is why Ordinance #618 is content-based.

By way of analogy, assume that a municipality passed an ordinance banning all billboards within the city from addressing the subject of abortion, regardless of the viewpoint. Although neutral regarding viewpoint, such a regulation would clearly be content-based. At oral argument, defendant's counsel agreed. We see no principled distinction between this hypothetical and Ordinance #618. In both instances, the government attempts to regulate an entire topic of protected speech as conveyed on a particular type of outdoor structure. And, "[b]road, prophylactic rules in the area of free expression are suspect. Precision of regulation must be the touchstone." *Schaumburg*, 444 U.S. at 637.

Finally, defendant City of St. Johns questions the level of scrutiny applied in *Schaumburg*, *Munson*, *Riley*, and *Abbott*. The City argues that *Schaumburg* did not "announce that strict scrutiny is to be applied" to regulations that impact speech on charitable solicitation. At oral argument, the City expounded on this point. Focusing on *Abbott*'s use of the word

"stricter" rather than "strict," *see* 647 F.3d at 212, the City argued that *Schaumburg* and its progeny applied a level of scrutiny "stricter than [that applicable] to commercial [speech] but not strict in the highest sense." We disagree. *Schaumburg* plainly applied strict scrutiny. *Compare Schaumburg*, 444 U.S. at 637 ("The Village may serve its legitimate interests, but it must do so by *narrowly drawn* regulations designed to serve those interests without unnecessarily interfering with First Amendment freedoms." (emphasis added)) *with Playboy Entm't Grp., Inc.*, 529 U.S. at 813 (in order to satisfy strict scrutiny, the government must show that the regulation at issue is "*narrowly tailored* to promote a compelling Government interest" (emphasis added)). So did *Munson* and *Riley*. *Munson*, 467 U.S. at 961; *Riley*, 487 U.S. at 791, 795. *See also Riley*, 487 U.S. at 810–11 (Rehnquist, C.J., dissenting) ("The Court concludes . . . that strict scrutiny should be applied and that the statute does not survive that scrutiny."). Moreover, the application of strict scrutiny in those cases was warranted because they, like this case, involved content-based restrictions of protected speech. *See, e.g., Riley*, 487 U.S. at 795.

C.

Because Ordinance #618 is a content-based restriction on speech, "it can stand only if it satisfies strict scrutiny." *Playboy Entm't Grp., Inc.*, 529 U.S. at 813. Thus, in order for the ordinance to pass constitutional muster, the City bears the burden to establish that it is "narrowly tailored to promote a compelling Government interest. If a less restrictive alternative would serve the Government's purpose, the [City] must use that alternative." *Id.* (citation omitted). Assuming, without deciding, that the City's stated interests in preventing blight and aesthetics are compelling, we hold that Ordinance #618 is not narrowly tailored to promote those interests.

The parties dispute whether the ordinance should be categorized as a "complete" or "total" ban on donation bins. The City has argued both sides of this point. In the district court, the City asserted, "the City's ban on donation boxes is complete." In its appeal, in its opening brief, the City asserts, "the City's ban was not complete." In its reply brief, the City attempts to clarify this contradiction as follows:

> To be sure, the ban was on occasion imprecisely labeled "total" [by the City]. But, as is clear from even a cursory review of the ordinance language, what is meant by "total" was that the ban was not limited to for-profit donation bins . . . [an approach] that would have distinguished between what was covered and what

was not on the basis of content, i.e., whether the entity was profit-making or non-profit.

This argument lacks merit. Even assuming that a for-profit/nonprofit distinction is a content-based one in the first place—and it is not clear that it is—there is no indication in the record that ensuring a ban on both for-profit and non-profit bins was the City's purpose in enacting the ordinance.

The City also argues that the ban is not complete—and thus satisfies strict scrutiny—because "only outdoor, unattended receptacles . . . are banned. Receptacles that are attended or not outdoors are allowed." This argument also misses the mark. The ordinance preemptively and prophylactically prevents all charities from operating outdoor, unattended donation bins within the City in the interest of aesthetics and preventing blight. This implies, without any evidence, that charities would be negligent in failing to conduct timely pickups of donated goods, in maintaining the appearance of the bins, etc. Further, it assumes that lesser, content-neutral restrictions such as requiring weekly or bi-weekly pickups or inspections of all outdoor receptacles would be ineffective.

"To prohibit this much speech is a significant restriction of communication between speakers and willing adult listeners, communication which enjoys First Amendment protection." *Playboy Entm't Grp., Inc.*, 529 U.S. at 812. Thus, "it is of no moment" whether the ordinance is labeled "complete" or "total" because "[t]he distinction between laws burdening and laws banning speech is but a matter of degree. The Government's content-based burdens must satisfy the same rigorous scrutiny as its content-based bans." *Id*.

For these reasons, we conclude that the district court did not err when it ruled that Planet Aid was likely to succeed on the merits of its First Amendment claim. And, because "[w]hen a party seeks a preliminary injunction on the basis of the potential violation of the First Amendment, the likelihood of success on the merits often will be the determinative factor," we affirm the district court's decision to grant the preliminary injunction. *Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998).

V.

For these reasons, we affirm the order of the district court.