RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 18a0008p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————

LEXINGTON H-L SERVICES, INC.,

                                   *Plaintiff-Appellee*,

        *v.*

LEXINGTON-FAYETTE URBAN COUNTY GOVERNMENT,

                                 *Defendant-Appellant*.

No. 17-5562

———————

Appeal from the United States District Court
for the Eastern District of Kentucky at Lexington.
No. 5:17-cv-00154—Karen K. Caldwell, Chief District Judge.

Argued: December 7, 2017

Decided and Filed: January 9, 2018

Before: CLAY, GIBBONS, and COOK, Circuit Judges.

———————

## COUNSEL

———————

**ARGUED:** Keith Moorman, FROST BROWN TODD LLC, Lexington, Kentucky, for Appellant. John A. Bussian, THE BUSSIAN LAW FIRM, PLLC, Raleigh, North Carolina, for Appellee. **ON BRIEF:** Keith Moorman, FROST BROWN TODD LLC, Lexington, Kentucky, for Appellant. John A. Bussian, THE BUSSIAN LAW FIRM, PLLC, Raleigh, North Carolina, Mark J. Prak, Charles E. Coble, Brian C. Fork, BROOKS, PIERCE, MCLENDON, HUMPHREY & LEONARD, L.L.P., Raleigh, North Carolina, for Appellee. Stephen Kiehl, COVINGTON & BURLING LLP, Washington, D.C., for Amicus Curiae.

———————

## OPINION

———————

CLAY, Circuit Judge. Defendant Lexington-Fayette Urban County Government ("the City") appeals an order granting a preliminary injunction issued by the district court. The order

enjoins the City's enforcement of Ordinance 25-2017 (the "Ordinance") based on the First and Fourteenth Amendment claims of Plaintiff Lexington H-L Services, Inc., d/b/a Lexington Herald-Leader ("Plaintiff"), brought pursuant to 28 U.S.C. § 1343(a)(3) and 42 U.S.C. § 1983. For the reasons set forth below, we **REVERSE** the district court's order and **VACATE** the injunction.

## BACKGROUND

The facts of the case are straightforward, and the parties do not challenge the following summary set forth by the district court:

> The Herald-Leader sells and distributes numerous publications, including *The Community News*, which is a weekly four- to six-page non-subscription publication. *The Community News* contains local news and advertising for the city of Lexington, Kentucky, and the surrounding area. The Herald-Leader delivers *The Community News* to businesses and residents in Fayette and neighboring counties. *The Community News* is delivered free of charge to more than 100,000 households each week.
>
> The Herald-Leader distributes *The Community News* by various means, including driveway delivery. However, the Herald-Leader's driveway method of delivering *The Community News* would be prohibited by an ordinance that Lexington has adopted.
>
> That ordinance, which [was scheduled to] go into effect on May 1, 2017, permits the delivery of "unsolicited written materials" only to six specific locations: (1) on a porch, if one exists, nearest the front door; (2) securely attached to the front door; (3) through a mail slot, if one exists; (4) between an exterior front door, if one exists and is unlocked, and an interior front door; (5) in a distribution box located on or adjacent to the premises, if permitted; or (6) personally with the owner, occupant, or lessee of the premises. Lexington, Ky., Ordinance No. 25-2017 (March 2, 2017). The ordinance provides for civil penalties for violations. *Id.*

*Lexington H-L Servs., Inc. v. Lexington-Fayette Urban Cty. Gov't*, 259 F. Supp. 3d 659, 662 (E.D. Ky. 2017) (record citations omitted).

Shortly after the City adopted the Ordinance, but before it went into effect, Plaintiff filed suit in the district court claiming that the Ordinance would violate its free speech and free press rights under the First Amendment, as applied to the City through the Fourteenth Amendment.

Plaintiff moved for a preliminary injunction to prevent enforcement of the Ordinance until the district court ruled on the merits of its claims. The district court granted Plaintiff's motion and enjoined enforcement of the Ordinance, finding that Plaintiff had demonstrated a likelihood of success on the merits. The City filed this timely appeal.

## DISCUSSION

### A. Standard of Review

When reviewing an order granting a preliminary injunction in a First Amendment case, this Court "review[s] the District Court's legal rulings *de novo* (including its First Amendment conclusion), and its ultimate conclusion as to whether to grant the preliminary injunction for abuse of discretion." *O'Toole v. O'Connor*, 802 F.3d 783, 788 (6th Cir. 2015) (citations omitted). We have explained this hybrid review process as follows:

> Whether the movant is likely to succeed on the merits is a question of law we review *de novo*. We review for abuse of discretion, however, the district court's ultimate determination as to whether the four preliminary injunction factors weigh in favor of granting or denying preliminary injunctive relief. This standard is deferential, but the court may reverse the district court if it improperly applied the governing law, used an erroneous legal standard, or relied upon clearly erroneous findings of fact.

*City of Pontiac Retired Employees Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (en banc) (internal citations, quotation marks omitted).

### B. Plaintiff's First Amendment Claim

The freedom of the press protects the "historic weapons in the defense of liberty." *Lovell v. City of Griffin, Ga.*, 303 U.S. 444, 452 (1938). "Liberty of circulating is as essential to that freedom as liberty of publishing; indeed, without the circulation, the publication would be of little value." *Ex parte Jackson*, 96 U.S. 727, 733 (1877). Door-to-door dissemination of ideas is therefore entitled to significant protection under the First Amendment, with courts treating front porches in many ways like a public forum. *See, e.g., Watchtower Bible & Tract Soc'y of New York, Inc. v. Vill. of Stratton*, 536 U.S. 150, 160 (2002). As such, the government may not

prohibit door-to-door distribution of pamphlets, periodicals, leaflets, or newspapers, and restrictions on such expression must withstand significant scrutiny. *See Lovell*, 303 U.S. at 452.

Our review of a restriction on circulation begins with the question of whether the restriction is content-based. *Planet Aid v. City of St. Johns*, 782 F.3d 318, 326 (6th Cir. 2015). Generally, content-based restrictions are subject to the most exacting form of scrutiny, in which we ask whether the "regulation is necessary to serve a compelling state interest" and whether it is "narrowly drawn to achieve that end." *Jobe v. City of Catlettsburg*, 409 F.3d 261, 266 (6th Cir. 2005) (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983)). Meanwhile, content-neutral restrictions on the time, place, or manner of circulation must survive only an intermediate level of scrutiny, in which we ask whether the restriction is "narrowly tailored to serve a significant governmental interest" and, if so, whether it "leave[s] open ample alternative channels for communication of the information." *See Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989) (internal quotation marks omitted).

The City argues that the district court incorrectly applied strict scrutiny despite holding, correctly, that the Ordinance is content-neutral. The City further argues that Plaintiff's First Amendment claim is unlikely to succeed when the correct level of scrutiny is applied. For purposes of this appeal, Plaintiff concedes that the Ordinance is content-neutral[1] and that the interests invoked by the City to justify the Ordinance are substantial.[2] Thus, an intermediate level of scrutiny applies, and we must ask whether Plaintiff can likely succeed in showing either that the Ordinance is not narrowly tailored or that the Ordinance does not leave open ample alternative channels for communication of the information. A likelihood of success on either issue would provide a basis to affirm the district court's First Amendment conclusion. *See Saieg*

---

[1]Plaintiff concedes that the Ordinance is content-neutral on its face because it applies to all unsolicited materials distributed door-to-door, regardless of the messages or viewpoints they contain.

[2]The City's proffered interests (reducing blight, reducing litter, and protecting private property) are indisputably substantial for purposes of the First Amendment inquiry. *See, e.g.*, *Jobe v. City of Catlettsburg*, 409 F.3d 261, 268 (6th Cir. 2005) ("[T]he ordinance advances two significant government interests: (1) It furthers the government's interest in prohibiting litter and visual blight; and (2) it furthers individuals' interests in having their private property left alone by those who do not have permission to use it.") (citing *Members of City Council of City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 805 (1984) and *Lloyd Corp. v. Tanner*, 407 U.S. 551, 570 (1972)). Plaintiff argues that "further factual development" will reveal that these governmental purposes are merely pretext for the City's intent to disrupt the distribution of Plaintiff's publication, *The Community News*. (*See* Pl. Br. 47–48.)

*v. City of Dearborn*, 641 F.3d 727, 740 (6th Cir. 2011) ("The requirements for a time, place, and manner restriction are conjunctive."). We address the two issues in turn.

### 1. Narrow Tailoring

In order to meet the narrow tailoring requirement, a restriction on circulation must be reasonable in light of the significant interests proffered by the government. *See Prime Media, Inc. v. City of Brentwood*, 398 F.3d 814, 821 (6th Cir. 2005) ("The fit between the City's means and ends [must be] a reasonable one.") There must be a sufficient basis—more than mere "speculation or conjecture"—to demonstrate that the restriction will further the governmental interests. *See Prime Media, Inc. v. City of Brentwood, Tenn.*, 398 F.3d 814, 823 (6th Cir. 2005) (citing *Ibanez v. Florida Department Business & Professional Regulation*, 512 U.S. 136 (1994) (applying intermediate scrutiny to commercial speech)).

A restriction must not burden "substantially more speech than necessary to achieve the [government]'s asserted interests." *McCullen v. Coakley*, 134 S. Ct. 2518, 2535–37 (2014). But the regulation "need not be the least restrictive or least intrusive means" of promoting a substantial governmental interest, nor is there any "stringent duty of calibration." *Prime Media*, 398 F.3d at 823; *see Ward*, 491 U.S. at 798–99. Indeed, a regulation does not violate the First Amendment "simply because there is some imaginable alternative that might be less burdensome on speech.'" *Ward*, 491 U.S. at 797. In all but the most "exceptional case," *McCullen*, 134 S. Ct. at 2535–37, "the requirement of narrow tailoring is satisfied 'so long as the . . . substantial government interest [] would be achieved less effectively absent the regulation,'" *Ward*, 491 U.S. at 799.

The City advances the following three substantial interests: (1) reducing visual blight; (2) reducing litter; and (3) preventing damage to and interference with private property.[3] For purposes of this appeal, we conclude that the Ordinance is narrowly tailored to further two of these interests.

---

[3]Although the parties treat "reducing litter" and "reducing visual blight" as a single governmental interest, we find the interests to be analytically distinct for purposes of determining whether the Ordinance is narrowly tailored.

### i. Reducing Visual Blight

At this stage, there is a reasonable basis to conclude that the Ordinance furthers the City's interest in reducing visual blight. This Court has previously explained that a government's power to reduce blight extends from its "weighty, essentially esthetic interest in proscribing intrusive and unpleasant formats for expression." *Jobe*, 409 F.3d at 268 (quoting *Taxpayers for Vincent,* 466 U.S. at 806). Thus, governments may prohibit certain forms of billboards, *Metromedia, Inc. v. San Diego*, 453 U.S. 490, 510, 522, 559–61, 570 (1981), and they may prohibit distribution of handbills on windshields, *Jobe*, 409 F.3d at 268. Similarly, the "visual assault . . . presented by an accumulation of signs posted on public property" justifies a restriction on posting signs on utility poles. *Taxpayers for Vincent*, 466 U.S. at 807.

In this case, the City argues that the Ordinance will reduce the visual blight caused by "haphazard" delivery of unsolicited materials. In support, the City explains:

> By [Planitiff's] own account, it is responsible for placing approximately 135,000 packets of unsolicited written materials on yards and driveways around Fayette County every week—a total of *more than seven million* packets of unsolicited materials each year. And that does not include the other unsolicited written materials that are distributed by other individuals and entities – phone books, flyers, discount offers, etc.

(Def. Br. 25.) Although some might disagree that the "haphazard" delivery of unsolicited materials constitutes visual blight, it is the City's esthetic opinion that matters at this stage of the First Amendment inquiry. *See Taxpayers for Vincent*, 466 U.S. at 821 (Brennan, J., dissenting) (explaining preferred analysis under which "before deferring to a city's judgment, a court must be convinced that the city is seriously and comprehensively addressing aesthetic concerns with respect to its environment").

The City's invocation of its esthetic interest does not appear to be speculative. In light of the millions of unsolicited materials delivered in its community each year, the City has a reasonable basis to believe that restricting such deliveries to the six locations set forth in the Ordinance will bring about a more consistent esthetic. In addition, requiring all unsolicited materials to be delivered to consistent, predictable locations could further reduce the visual impact of such materials by increasing the chances that recipients will find and collect the

materials.  Finding no argument by Plaintiff to the contrary, we conclude that Plaintiff is unlikely to prove that the City's esthetic interest "would be achieved less effectively absent the regulation." *See Ward*, 491 U.S. at 797.

### ii.  Reducing Litter

There is also a reasonable basis to conclude that the Ordinance furthers the City's interest in reducing litter.  The City makes several arguments in support of this finding, only some of which are persuasive.  We are not persuaded, for instance, by the City's assertion that the act of delivering unsolicited written materials to lawns and driveways *itself* constitutes littering. Written materials left in a front yard maintain their expressive nature and cannot, as Plaintiff suggests, be equated with those scattered "from the window of a tall building or a low flying airplane." (Def. Br. 27.)  Indeed, door-to-door circulation is one of America's most important "vehicles for the dissemination of ideas," and people expect to receive information in their yards—even from anonymous and unexpected sources. *Watchtower Bible*, 536 U.S. at 162; *see Lovell*, 303 U.S. at 452.  The City cannot demonstrate that the Ordinance will reduce litter merely by reducing the amount of written materials sitting on lawns and driveways.

The City's more compelling argument is that some unsolicited materials can and do migrate to public property, whereupon they become litter.  In support, the City cites evidence of unsolicited written materials becoming litter that was compiled by another city before enacting a similar ordinance. *See Courier-Journal, Inc. v. Louisville/Jefferson Cty. Metro Gov't*, No. CIVA 3:09CV-449-S, 2009 WL 2982923, at *6 (W.D. Ky. Sept. 11, 2009).  Cities may generally rely on such data without enduring the expense of conducting their own research. *See Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 51 (1986).  Additionally, the district court concluded that the City in this case "had comparable evidence to consider before enacting its ordinance." *Lexington H-L Servs.*, 259 F. Supp. 3d 659, 665–66 (E.D. Ky. 2017).  Two members of the city council reported that they "observed unsolicited materials being washed into storm sewers," and one of the council members "raised concerns that the impact on storm sewers may cause problems under a consent decree between the EPA and [the City] regarding, among other things, storm water issues." (Def. Br. 6.)  There is a sufficient basis to conclude that the Ordinance will

reduce litter because it requires written materials to be securely fastened to a front door, left near a front door, or delivered directly to a resident.

Plaintiff admits that residents do not always pick up the unsolicited materials it delivers but insists that litter is nevertheless a minimal concern because Plaintiff maintains an opt-out list, "samples neighborhoods by the end of each week," and "picks up any publication[s] remaining" in the sampled neighborhoods. (Pl. Br. 20.) But by admitting that Plaintiff reduces the environmental impact of its publication in *some* neighborhoods, Plaintiff admits that its environmental impact remains unchecked everywhere else. Plaintiff is therefore unlikely to succeed in showing that the City's interest in reducing litter "would be achieved less effectively absent the regulation." *See Ward*, 491 U.S. at 797.

### iii. Reducing Damage To and Interference With Private Property

The City has provided no basis to conclude that the Ordinance will further its interest in protecting private property. Some Americans will inevitably be annoyed when unsolicited materials are delivered to their homes. They might even disagree with the content of such materials, particularly when they find the content to be shocking or offensive. But the First Amendment does not promise insulation from mere annoyance or offense, *see, e.g., Cohen v. California*, 403 U.S. 15 (1971) (discussing expressive value of wearing a jacket emblazoned with a vulgar phrase), and irritation alone does not transform speech into an interference with or damage to private property.

This is not to say that the City could not prohibit door-to-door messengers from engaging in harmful conduct such as harassment or destruction of property. But the City does not suggest that the Ordinance is designed with such conduct in mind. Rather, the City defends its interest in protecting private property as an interest in protecting residents from encountering unwanted messages. The City also emphasizes that the Ordinance prevents unsolicited materials from being delivered to haphazard locations such as private sidewalks, driveways, and rights of way, but it fails to explain how the placement of unsolicited materials in these locations damages private property. To the contrary, private sidewalks, driveways, and rights of way are locations where homeowners are perhaps the most likely to find the materials, pick them up, and receive

their messages.   At best, the City's assertions amount to "speculation or conjecture"—an insufficient basis to invoke even the most significant governmental interests.  *See Prime Media, Inc. v. City of Brentwood, Tenn.*, 398 F.3d 814, 823 (6th Cir. 2005).  As such, Plaintiff can likely show that the Ordinance is not narrowly tailored to further the City's interest in protecting private property.

### iv.  Overbreadth

Rather than seriously disputing whether the Ordinance will further any of the City's interests, Plaintiff asserts that the Ordinance burdens "substantially more speech than necessary to achieve the [government]'s asserted interests."  *McCullen*, 134 S. Ct. at 2537.  Plaintiff argues, incorrectly, that the district court reached its First Amendment conclusion on this basis.  (P. Br. 25.)  Regardless, we find Plaintiff's overbreadth argument unavailing.

As an initial matter, the district court did not engage in the overbreadth analysis from *McCullen*.  Instead, the district court concluded that Plaintiff "has shown a likelihood of success on the merits of its claim that the opt-out option is a *less restrictive alternative*."  *Lexington H-L Servs.*, 259 F. Supp. 3d at 667 (emphasis added).  Plaintiff argued below, as it does here, that it permits residents to opt-out of its distribution list and that the City's less restrictive option is to promote the use of such opt-out lists.  Although we are skeptical that opt-out lists are a comparable alternative to the restrictions of the Ordinance, Plaintiff's argument has a more fundamental flaw:  the Supreme Court has repeatedly rejected the notion that restrictions on the time, place, or manner of speech violate the First Amendment merely because a less restrictive alternative is available.  In *Ward*, the Court explained:

> Indeed, in *Community for Creative Non-Violence*, we squarely rejected reasoning identical to that of the court below:
>
>> "We are unmoved by the Court of Appeals' view that the challenged regulation is unnecessary, and hence invalid, because there are less speech-restrictive alternatives that could have satisfied the Government interest in preserving park lands. . . .
>
> Lest any confusion on the point remain, we reaffirm today that a regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the

> government's legitimate, content-neutral interests but that it need not be the least restrictive or least intrusive means of doing so. Rather, the requirement of narrow tailoring is satisfied "so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *United States v. Albertini*, 472 U.S. 675, 689, 105 S.Ct. 2897, 2906, 86 L.Ed.2d 536 (1985); see also *Community for Creative Non-Violence, supra*, 468 U.S., at 297, 104 S.Ct., at 3071. To be sure, this standard does not mean that a time, place, or manner regulation may burden substantially more speech than is necessary to further the government's legitimate interests. Government may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals. See *Frisby v. Schultz*, 487 U.S., at 485, 108 S.Ct., at 2502 ("A complete ban can be narrowly tailored but only if each activity within the proscription's scope is an appropriately targeted evil"). So long as the means chosen are not substantially broader than necessary to achieve the government's interest, however, the regulation will not be invalid simply because a court concludes that the government's interest could be adequately served by some less-speech-restrictive alternative. "The validity of [time, place, or manner] regulations does not turn on a judge's agreement with the responsible decisionmaker concerning the most appropriate method for promoting significant government interests" or the degree to which those interests should be promoted. *United States v. Albertini*, 472 U.S., at 689, 105 S.Ct., at 2906; see *Community for Creative Non-Violence, supra*, 468 U.S., at 299, 104 S.Ct., at 3072.

*Ward*, 491 U.S. at 798–800. The district court therefore erred in its analysis; a less restrictive alternative, even if proven, would not affect Plaintiff's success on the merits. *See id.*

In the context of intermediate scrutiny, a finding of overbreadth requires a showing that Plaintiff has not made. In *McCullen*, the Supreme Court examined a Massachusetts statute that it described as "truly exceptional." 134 S. Ct. at 2537. The law criminalized the act of knowingly standing on a "public way or sidewalk" within 35 feet of an entrance or driveway to any place, other than a hospital, where abortions are performed. *Id.* at 2525. Finding the statute to be content-neutral and applying intermediate scrutiny, the Court concluded that the law was not narrowly tailored to further the state's substantial interests in "public safety, patient access to healthcare, and the unobstructed use of public sidewalks and roadways" because the law's practical effect was to prohibit *all* face-to-face interaction—including all conversation and all pamphleteering. *See id.* at 2535–37. Face-to-face interaction, the Court noted, is "the essence of First Amendment expression" and has no adequate substitute. *Id.* at 2536 (quoting *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995)). Cutting off direct interaction and allowing

little more than chanting and holding signs from 35 feet away therefore burdened "substantially more speech than necessary to achieve the Commonwealth's asserted interests." *Id.* The Court also noted that the state failed to defend the overbreadth of its law with any evidence that it had first "look[ed] to less intrusive means of addressing its concerns." *Id.* at 2539.

In this case, Plaintiff fails to develop an overbreadth argument. As *McCullen* illustrates, a government's failure to consider less restrictive alternatives is only relevant once a restriction is shown to be overbroad. *See id.* at 2535–37. Because Plaintiff argues that its opt-out idea is a less restrictive alternative to the Ordinance but does not show that the Ordinance is overbroad, Plaintiff's overbreadth argument cannot succeed on the merits.

Accordingly, Plaintiff has not shown a likelihood of success on the issue of narrow tailoring, and we proceed to the second question before us.

## 2. Alternative Channels

In applying intermediate scrutiny, we must also determine whether the Ordinance leaves open ample alternative channels of communication. *Jobe*, 409 F.3d at 267. We conclude that it does. Although the Ordinance restricts the distribution of unsolicited written materials, it has no impact on other forms of expression in front yards. In this way, the Ordinance resembles the restriction in *Frisby*, which prohibited "picketing focused on, and taking place in front of, a particular residence." *See Frisby v. Schultz*, 487 U.S. 474, 483 (1988). The Supreme Court found the *Fribsy* restriction permissible because, much like the Ordinance in this case, it preserved the right for individuals to march through neighborhoods, travel door-to-door to proselytize, and leave literature with residents. *See id.*

The restrictions of the Ordinance also preserve numerous methods for distributing written materials. The Ordinance targets only "unsolicited" written materials; with consent, written materials may be delivered without restriction. Without consent, unsolicited written materials still may be distributed so long as the materials are: (1) left on the front porch; (2) securely attached to a front door; (3) inserted through a mail slot; (4) placed between an exterior and interior front door; (5) placed in a distribution box; or (6) delivered personally to the owner,

occupant and/or lessee. Rather than encumbering speech, these requirements appear to *increase* the likelihood that written materials will successfully deliver their messages.

In *Schneider v. State of New Jersey, Town of Irvington*, the Supreme Court analyzed a law that prohibited altogether the door-to-door distribution of handbills. 308 U.S. 147, 164 (1939). In finding the law unconstitutional, the Court explained the First Amendment concerns in the context of door-to-door circulation:

> [P]amphlets have proved most effective instruments in the dissemination of opinion. And perhaps the most effective way of bringing them to the notice of individuals is their distribution at the homes of the people. On this method of communication the ordinance imposes censorship, abuse of which engendered the struggle in England which eventuated in the establishment of the doctrine of the freedom of the press embodied in our Constitution.

*Id.* By contrast, the Ordinance in this case preserves the right for individuals to distribute materials directly to residents and to place them on and around residents' front doors. On its face, then, the Ordinance does not censor or oppress; it merely prohibits materials from being delivered to locations where residents are unlikely to receive their messages. *See Jobe*, 409 F.3d at 270 ("There is nothing special about . . . a lawn . . . that invites others to place leaflets or advertisements on it without the owner's consent."). This suggests that the Ordinance preserves ample channels for expression.

Nevertheless, Plaintiff argues that its own particular circumstances demonstrate an insidious constitutional concern. Plaintiff argues that the methods of distribution preserved under the Ordinance are not ample because they are not as efficient or affordable as its current method of driveway delivery. Indeed, Plaintiff asserts that complying with the Ordinance will double the delivery costs for one of its publications, *The Community News*, and that the additional cost will lead to that publication's immediate demise. We are not persuaded that this argument is likely to succeed on the merits.

In *Jobe*, the plaintiff made the same argument with regard to an ordinance that proscribed the distribution of leaflets on car windshields. *See* 409 F.3d at 272–73. Although we found that cost-effectiveness and efficiency are indeed relevant to the First Amendment inquiry, we

explained that some methods of expression can be prohibited despite a lack of equally cheap and efficient alternatives:

> [Plaintiff argues that] the ordinance does not leave open ample alternative channels because "the unique efficiency of leafletting [sic] cars downtown cannot be replicated [ ] by driving door to door throughout a rural county, by hand-delivering to people as they walk by, or by leafleting drivers." "To the contrary," he continues, "the only efficient and effective way to leaflet those who come to town (residents and visitors) is to leaflet cars that congregate in a finite area." Jobe has a fair point here because the Supreme Court in fact has been quite sensitive to the need to permit inexpensive methods of spreading ideas and information. *See Gilleo*, 512 U.S. at 57, 114 S.Ct. 2038 (striking ordinance that prevented homeowners from displaying signs in their own windows and commenting that "[r]esidential signs are an unusually cheap and convenient form of communication"); *Martin*, 319 U.S. at 146, 63 S.Ct. 862 ("Door to door distribution of circulars is essential to the poorly financed causes of little people."); *Watchtower Bible & Tract Soc'y of New York*, 536 U.S. at 162, 122 S.Ct. 2080 ("[P]erhaps the most effective way of bringing [pamphlets] to the notice of individuals is their distribution at the homes of the people.") (quoting *Schneider*, 308 U.S. at 164, 60 S.Ct. 146).
>
> But "[a]lthough the Court has shown special solicitude for forms of expression that are much less expensive than feasible alternatives and hence may be important to a large segment of the citizenry, this solicitude has practical boundaries." *Taxpayers for Vincent*, 466 U.S. at 812 n. 30, 104 S.Ct. 2118 (citations omitted). "That more people may be more easily and cheaply reached by sound trucks," the Court has noted, "is not enough to call forth constitutional protection for what those charged with public welfare may reasonably think is a nuisance when easy means of publicity are open." *Kovacs v. Cooper*, 336 U.S. 77, 88-89, 69 S.Ct. 448, 93 L.Ed. 513 (1949); *see also Taxpayers for Vincent*, 466 U.S. at 812 n. 30, 104 S.Ct. 2118 (citing *Metromedia*, 453 U.S. at 549-50, 101 S.Ct. 2882 (Stevens, J., dissenting in part), for the proposition that a "ban on graffiti [was] constitutionally permissible even though some creators of graffiti may have no equally effective alternative means of public expression"). . . . In the end, the fact that a means of communication is efficient and inexpensive does not automatically trump other government interests. At some point, the very cheapness of a mode of communication may lead to its abuse. As the Court explained in *Taxpayers for Vincent*: "A distributor of leaflets has no right simply to scatter his pamphlets in the air-or to toss large quantities of paper from the window of a tall building or a low flying airplane. Characterizing such an activity as a separate means of communication does not diminish the State's power to condemn it as a public nuisance." 466 U.S. at 809, 104 S.Ct. 2118.

*Id.* (record citations omitted).

The same principles apply in this case. Although written materials thrown onto lawns and driveways are probably not as likely to become litter as those left on the windshields of unoccupied vehicles, *see id.*, or scattered from low-flying airplanes, *see Taxpayers for Vincent*, 466 U.S. at 809, Plaintiff cannot dispute that the millions of unsolicited materials it delivers are capable of causing similar public harms. The mere fact that Plaintiff's business cannot survive without this harmful method of delivery does not render the Ordinance unconstitutional. *See The Pitt News v. Fisher*, 215 F.3d 354, 366 (3d Cir. 2000) ("The fact that *The Pitt News* is a newspaper does not give it a constitutional right to a certain level of profitability, or even to stay in business at all. *The Pitt News* 'proceeds on the erroneous premise that it has a constitutional right not only to speak, but to speak profitably.'"). Because the Ordinance preserves a wide range of alternative methods for expression that are inexpensive, efficient, and effective, Plaintiff has not shown a likelihood of success on the merits.

The district court came to the opposite conclusion, finding that the Ordinance would not "leave open 'inexpensive' alternative routes for communication, at least in the case of *The Community News*." *Lexington H-L Servs.*, 259 F. Supp. 3d at 668. The court highlighted language from *Jobe* suggesting that restrictions on expression must preserve "numerous ways to distribute literature and information in an *inexpensive*, efficient and productive manner." *Id.* (quoting *Jobe* and adding emphasis). Expense, however, cannot be considered in isolation; it must be balanced against the harms that can arise when cheap and efficient methods of circulating written materials are abused. *See* 409 F.3d at 272. The district court erred by failing to consider this additional factor.

Plaintiff therefore has not shown a likelihood of success on the merits with regard to its First Amendment claims.

## C. Preliminary Injunction

The district court's discretion extends to "whether the four preliminary injunction factors weigh in favor of granting or denying preliminary injunctive relief." *City of Pontiac Retired Employees Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (en banc) (internal citations, quotation marks omitted). These four factors are: "(1) whether the movant has a strong

likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by issuance of the injunction." *Id.*

Because we find that Plaintiff is unlikely to succeed on the merits of its First Amendment claim, we conclude that the district court abused its discretion in granting Plaintiff's motion for a preliminary injunction. *See Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) ("When a party seeks a preliminary injunction on the basis of a potential constitutional violation, 'the likelihood of success on the merits often will be the determinative factor.'") (quoting *Jones v. Caruso*, 569 F.3d 258, 265 (6th Cir. 2009)).

## CONCLUSION

In conclusion, Plaintiff has not shown a likelihood of success on the merits of its First Amendment Claim. The City has provided a reasonable basis to conclude that the Ordinance will further two of its substantial interests. The Ordinance also preserves numerous alternative methods for expression that are inexpensive, efficient, and effective. Consequently, the district court erred in its First Amendment analysis and abused its discretion when it issued an order granting a preliminary injunction.

For the foregoing reasons, we **REVERSE** the district court's order and **VACATE** the injunction.